[Cite as *State v. Simpson*, 2013-Ohio-1072.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                               :

     Plaintiff-Appellee                    :          C.A. CASE NO.    25069

v.                                                    :          T.C. NO.    11CR1356/1

KERON SIMPSON                          :          (Criminal appeal from
                                                                  Common Pleas Court)
     Defendant-Appellant                :

                                                      :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____22nd____ day of _____March_____, 2013.

. . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
       Attorney for Plaintiff-Appellee

JON PAUL RION, Atty. Reg. No. 0067020 and NICOLE RUTTER-HIRTH, Atty. Reg. No. 0081004, 130 W. Second Street, Suite 2150, P. O. Box 1262, Dayton, Ohio 45402
       Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**   This matter is before the Court on the Notice of Appeal of Keron Simpson,

filed

March 5, 2012. Simpson appeals from his February 9, 2012 conviction and sentence on twelve counts of aggravated robbery, in violation of R.C. 2911.01(A)(1), each with a firearm specification and all felonies of the first degree, and two counts of murder, in violation of R.C. 2903.02(B), both unclassified offenses and both with firearm specifications. Simpson was also found guilty by the court, after a bench trial, of having weapons while under disability (prior offense of violence), in violation R.C. 2923.13(A)(2), a felony of the third degree. The court merged count one, aggravated robbery, into count 14, murder, and it merged count two, aggravated robbery, into count 13, murder, for sentencing purposes, and it noted that the State elected to proceed to sentencing on counts 13 and 14. The court sentenced Simpson to ten years on the remaining aggravated robbery offenses (counts three through 12), to fifteen years to life on each murder offense, and to 36 months for having weapons while under disability. The court ordered that the murder sentences be served consecutively to each other; that the sentences for aggravated robbery be served concurrently to each other and concurrently to the consecutive murder sentences; and that the sentence for having weapons while under disability be served concurrently to the above sentences. The court merged all the firearm specifications into one three-year firearm specification and imposed a three-year term to be served consecutively and prior to the definite term of imprisonment, for a total term of 33 years to life. Finally, the court ordered restitution to Marva Clemmons, Annette Dillard, and Joel Kimbrell. We hereby affirm the judgment of the trial court.

{¶ 2}    Simpson was indicted on April 29, 2011, along with Daviontae Norvell and Earl Moon, after Michelle Carter and Earnest Sanders, who was known as Hank, were killed

during the commission of an aggravated robbery at an unlicensed liquor establishment owned by Sanders, known as Hank's, located at 1564 Germantown Street. The incident occurred in the early morning on November 14, 2010. On May 31, 2011, Simpson filed a motion to suppress, which the court overruled after a hearing.

{¶ 3} At the suppression hearing, Detective Rebecca Rose, who has 24 years of law enforcement experience, testified that she investigated the incident, and that she worked in conjunction with Dayton Police Detectives Greg Gaier and Tim Bilinski, as well as Agent Tim Ferguson of the F.B.I. Rose stated that Ferguson and Bilinski are assigned to the federal Safe Streets Task Force. Rose stated that a week after the incident, Gaier received a tip from a confidential informant that Simpson "admitted to being involved in this crime." She stated that Moon and Norvell were arrested in early December for an unrelated crime, and that Norvell's cell mate later contacted the police department and provided the names of Norvell, Moon and Simpson in connection with the incident.

{¶ 4} Rose testified that she assembled a six person photo spread of each defendant. She identified her department's policy, effective July 6, 2010, based on the Ohio Revised Code, for assembling photo spreads. Rose described the procedure, stating that by means of the Justice Web system, she enters the suspects' social security numbers to retrieve their photos, as well as multiple candidates with similar identifiers, from which she selects five photos to complete the photo spread. Rose stated she uses the "default system," which selects candidates based on the similar identifiers of age, height, weight and skin tone. She identified Simpson's six-photo spread and indicated that his photo is in position number two. She stated that the photos are in color, and that each of the Defendants' photos were in different positions in the photo spreads

because she "did not want my witnesses to possibly go to one picture over and over. I wanted them to look thoroughly over each photo spread."

{¶ 5} Rose stated that on January 3, 2011, she, along with Ferguson and Detective Rick Bergman of the Montgomery County Sheriff's Office, who is also a member of the Safe Streets Task Force, met with Joseph Barney, a patron on the day of the incident, to show him the photo spreads. Rose testified that she read the photo spread instructions to Barney, with the exception of the instruction that she is unaware of the suspects' identities. Rose stated that she knew the identities of all the suspects, and that she tried unsuccessfully to find an administrator who did not know Simpson's identity. According to Rose, "a week-and-a-half prior to showing these photo spreads, Keron Simpson was accused of shooting a Dayton police officer's son in the face. All the detective section knew who he was. He had other multiple cases active * * *." Rose stated that at the time, she and the other officers believed that the Defendants would be federally prosecuted, and that a blind administrator is not required to administer photo spreads in the federal system. As to Simpson's photo spread, Rose testified that Barney pointed to both Simpson and the photo in position number five "and said that he could not make a positive identification but he felt that they were like and similar to the person inside Hank's Place when it was robbed." Barney did not identify Norvell, and in Moon's photo spread, he "said the person in Photo No. 2 and Photo No. 1 looked like the guy who had hazel eyes that was inside the bar during the robbery * * * but he could not make a positive identification."

{¶ 6} Rose stated that she, along with Ferguson and Bergman, on the same day, next showed the photo spreads to Brandon Fields, another patron at the crime scene, and that she read the instructions to him as discussed above. Fields did not identify Simpson or Norvell, but Rose

stated that he identified Moon "as being in Hank's Place at the time of the robbery." Rose stated that she, Ferguson and Bergman, on the same day, next showed the photo spreads to Tyrone Green, also a patron of the crime scene, again reading the instructions as discussed. She stated that when shown the photo spread of Simpson, Green "became very emotional. He started crying. His voice raised. He started pointing to the photo of No. 2 saying this is the man who killed my friend; this is the man who shot Hank. * * *." Rose stated that Green also identified Moon, but he was unable to identify Norvell.

{¶ 7}   Rose stated that she and Detective Gaier also on the same day showed the photo spreads to Terrence Jones, another Hank's patron, again reading the instructions as discussed. Jones identified Simpson and Moon, but not Norvell. Rose testified that she alone on the same day next showed the photo spreads to Marva Clemmons, who was present the night of the incident, again reading the instructions as discussed. Clemmons did not identify any of the suspects. Rose stated that next she alone on the same day showed the photo spreads to Cornelius Foster, and after reading the same instructions to him, Rose stated that Foster did not make any identifications. Rose testified that on January 4, 2011, she alone showed the photo spreads to Vanessa Dobbins, after providing the same instructions. Dobbins had left Hank's prior to the shooting, Rose testified, and  Dobbins identified Simpson and also identified Norvell, but not Moon.

{¶ 8}   Rose described how she documented each witnesses' identifications on black and white copies of the photo spreads, and she testified that neither she nor the other officers suggested any suspects to the witnesses, nor did the officers confirm any identifications. She stated that she instructed the witnesses not to talk to other witnesses. Rose stated that none of

the witnesses who made identifications wavered in doing so.

{¶ 9}   Rose stated that Simpson was arrested in the late hours of December 27, 2010, pursuant to an unrelated  robbery warrant, and that she interviewed him the following day regarding the instant case.   Rose stated that she initially introduced herself and offered Simpson water or a restroom break.   She then went over a pre-interview form with him, advising him of his rights.   She identified the form and stated that it indicates a time of 10:50 a.m., and further indicates that Simpson was being interviewed regarding a homicide investigation.   Rose stated that Simpson advised her that he previously had been read his rights.   Rose testified that Simpson was unable to read, and that she read each individual right to him and had him place his initials by each right to indicate his understanding thereof.   Rose testified that she read the waiver of rights to Simpson, and that she defined the word "coercion" for him.   Rose testified that Simpson told her that he had completed 11 years of school, and that he so indicated on the rights form.    Rose stated that Simpson made statements to her over a period of one hour and 22 minutes.   Rose stated that the interview was recorded.

{¶ 10}   On cross-examination, Rose acknowledged that Simpson has a "scar" from a "severe injury" on his forehead, and that he is the only individual with such a scar in his photo spread.[1]   On redirect examination, Rose stated that the similar characteristics among the photos in Simpson's photo spread included braids, similar skin tone, height, weight, age and lack of facial hair.   She stated that the men in positions one and four have asymmetrical hairlines, that the hairline of the person in position three is not visible, and that the hairline of the man in

---

[1]We note that at trial, multiple witnesses testified that Simpson wore a hat in the course of the incident.

position six is "obstructed." Rose stated, "I want to make sure my witnesses are able to pick them out. I want them to look at all the pictures. And I want to make it hard for them." Rose stated that she told the witnesses that each array may or may not contain a photo of the suspect. Rose stated that federal charges were brought against Simpson before state charges, and that the federal charges were later dismissed.

{¶ 11} Regarding her interview of Simpson, Rose stated that he remained in the detective section overnight following his arrest the night before. She stated that she moved him to another interview room so that the interview could be recorded. She stated that she offered him something to eat. Rose stated that she advised him that she was investigating a homicide at a "boot joint."

{¶ 12} On recross-examination, given Simpson's scar, Rose acknowledged that it would have been simple to cover the foreheads of the subjects in Simpson's photo spread before administering the array to the witnesses, and the following exchange occurred:

Q. But you chose not to do it, didn't you?

A. Yes.

Q. Because you were inflamed. He was a suspect on shooting a police officer's son and there was a lot of fury within the police department and you wanted Keron Simpson; isn't that correct? * * *

A. I wanted him on this murder.

Q. * * * As a matter of fact, on State's Exhibit 1, the photo spread that's got Keron Simpson in it, we've been talking about. If you read that, it says photographic show-up investigation must be read verbatim. Doesn't it say that?

A. Yes.

Q. And the police required procedure says it. It must be read, verbatim; isn't that correct?

A. Yes.

Q. It wasn't done in this case was it?

A. No.

{¶ 13} Homicide Detective Gregory Gaier of the Dayton Police Department testified that he has been in law enforcement for 20 years, a homicide detective for three years, and a member of the Safe Streets Task Force for a year. Gaier testified that he transported Simpson to the Safety Building following his December 27, 2010 arrest. Gaier stated that he and Detective Debra Ritchey interviewed Simpson regarding the unrelated aggravated robbery, after Ritchey advised him of his rights using a pre-interview form. Gaier identified the signed pre-interview form which indicates a time of 11:37 p.m. Gaier stated that Simpson indicated his understanding of each right read to him by placing his initials next to each right. Regarding the waiver of his rights, Gaier stated that the word "coercion" was defined for Simpson. Gaier stated that Simpson signed the form and agreed to speak to the officers without an attorney.

{¶ 14} Gaier stated that he and Agent Ferguson interviewed Simpson about the matter herein 35 to 45 minutes later. Gaier stated that he "heard Special Agent Ferguson ask him if he understood his rights from when they were previously read to him and he stated that he did." Gaier stated that he and Ferguson did not advise Simpson of his rights a second time. Gaier stated that Simpson was cooperative and coherent, and that he did not ask for a break or indicate that he was tired in either interview. Gaier stated that Simpson was offered water and restroom

breaks. Gaier stated that in the interview regarding the matter herein, Simpson did not ask for a lawyer, and that he was not threatened or promised anything in exchange for his statements. Gaier stated that the second interview lasted for "around 20 minutes." Gaier stated that Simpson did not provide a written statement.

{¶ 15} Gaier stated that on January 3, 2011, he and Detective Tim Bilinski showed photo spreads to Shawn Dentel, who was present on the night of the incident. Gaier stated that he read the instructions to Dentel prior to showing her the pictures, and that he omitted the instruction that he was unaware of the suspect's identity. When shown Simpson's photo spread, Gaier testified that Dentel "immediately pointed to the photograph, No.2, and said he's the one that shot Hank." She also identified Moon and Norvell. Gaier stated that he and Bilinski next on the same day showed the photo spreads to Joel Kimbell after reading the instructions as discussed above. Kimbell identified Simpson and Norvell without hesitation, but not Moon. Gaier described how he documented the identifications, and he stated that he and Bilinski did not suggest that the witnesses select any of the suspects.

{¶ 16} On cross-examination, Gaier stated that when Simpson was initially interviewed by him and Ritchey, Simpson was not advised that he was being interviewed regarding the matter herein. Gaier stated that at the conclusion of that interview, he and Ritchey left the room to discuss the case, and Ferguson entered the room to interview Simpson. Gaier stated that he re-entered the room to assist Ferguson, about a minute after Ferguson entered the room. Gaier stated that Ferguson advised Simpson, after ascertaining that Simpson understood the rights previously read to him, that he was going to interview Simpson about the instant matter. Gaier stated that the interview was not recorded. Gaier stated that Ferguson interviewed Simpson as

part of the Safe Streets Task Force federal investigation. After the interview, Gaier stated that Simpson was booked into the Montgomery County Jail pursuant to the unrelated aggravated robbery warrant.

{¶ 17} Detective Kevin Phillips testified that he has worked in law enforcement for 21 years and that he has been assigned to the Safe Streets Task Force since May, 2010. He stated that Rose provided color photo spreads to him for Simpson, Norvell and Moon. Phillips stated that on January 3, 2011, he and Special Agent Mark Buzzard of the F.B.I. showed the photo spreads to Annette Dillard, another patron of the crime scene. Phillips stated that he read the instructions to Dillard verbatim, including the instruction that he did not know the identities of the suspects. Phillips stated that Dillard identified Simpson "immediately," as well as Norvell, without wavering, but not Moon. Phillipps stated that on the same day, he and Buzzard also showed the photo spreads to Brian Whiteside, again reading the instructions verbatim. Whiteside identified Simpson "immediately," and he "specifically, added that he was the one doing the shooting." Whiteside also identified Moon, but he did not identify Norvell. Finally, Phillips stated that he and Buzzard met with another victim of the robbery, Erica Peek, on January 3, 2011, and after reading her the instructions verbatim, showed her the photo spreads. Peek identified Simpson immediately and "added that he was also a shooter." Peek did not identify Moon or Norvell. Phillips described the manner in which he documented all of the identifications, and he stated that he did not tell the witnesses whom to identify or suggest any suspects to them, and he stated that he did not confirm the identifications. On cross-examination, Phillips stated that he was aware at the time he administered the photo spreads of the Dayton Police Department policy requiring a blind administrator, and that he did

not follow that policy when administering Simpson's photo spread.

{¶ 18}    In overruling Simpson's Motion to Suppress, the trial court summarized the administrations of the above photo spreads and the results thereof.   The court noted that it found the witnesses' testimony at the suppression hearing to be credible. The court determined that the investigating officers, "neither by word nor gesture, did nothing (sic) to suggest to the various witnesses the identity of the Defendants. That this is so is reflected by the number of witnesses unable to make an identification of any Defendant and also the number of witnesses who were able to identify only one or two Defendants."   The court further found that the photographic displays that the officers used were not unduly suggestive, and specifically that "[t]his is so even in the face of the particular difficulties created by Mr. Simpson's hairline." The court found that the "photographic line-up procedures used in this case did not, without dispute, comply with the procedure outlined by O.R.C. 2933.83(B), in particular the line-ups were not conducted by a blind administrator."   The court further noted that, while the State asserted that the use of a blind administrator was impracticable, the line-up administrators did not state in writing the reason for the impracticality, as required by R.C. 2933.83(B)(2).   After noting that the "rationale for suppressing an out of court identification is that a defendant's due process rights are violated by the admission of an unreliable identification," the court concluded that the "Defendants, even when the O.R.C. 2933.83 deviations are considered, have not established that the identification procedures used were unduly suggestive.  The Defendants, this being so, have not established the necessary substantial likelihood of misidentification as to any of the photographic line-ups, making a reliability determination unnecessary."

{¶ 19}   Regarding Simpson's statements made while in custody, the court determined

that he was properly advised of his *Miranda* rights, and that his waiver of those rights was knowing and voluntary. The court noted that "there is nothing in the record to suggest, based upon physical violence, threats, false promises, or any other reason," that Simpson's *Miranda* waiver was involuntary.

{¶ 20} At trial, which commenced on July 6, 2011, Shawn Dentel testified that Earnest Sanders was her fiancee. At the time of the incident, she and Sanders resided at 1564 Germantown Street. Dentel stated that Sanders had been operating a bar in the basement of that residence for 28 years, and that the usual patrons were an "older crowd." Dentel stated that the bar typically opened at 2:30 a.m., and that to gain entrance, patrons rang a doorbell, and Tyrone Green would answer the door. Dentel stated that she served drinks from behind the larger of two bars in the basement.

{¶ 21} Dentel stated that on November 13, 2010, she had a beer and a shot of liquor "between nine and eleven" p.m., before the bar opened. She stated that Vanessa Dobbins arrived at the bar between 1:00 and 1:30 a.m., and that she had continued drinking and done some cocaine prior to Dobbins' arrival. Dentel stated that despite her drug and alcohol usage, she was able to "count money and know who was at the bar and everything." After the bar opened, Dentel testified that "there was three guys that came down there that I didn't know. And I went upstairs and told Hank that they did look young and I have never seen them in the bar before." Dentel stated that when she returned downstairs, she passed by all three men on her way to the larger bar, and that she was "really close" to them, and that the basement area is a cramped space. Dentel stated that the three men sat at the smaller of the two bars in the basement, and Simpson, whom she identified in court, "came up to the bar to get three Bud Ice."

Dentel stated that Simpson "had dreadlocks. He had a hat on, black coat." She stated that she and Simpson were within an arm's length of each other when she served him the beer. Dentel stated that of the three young men, Simpson had the darkest complexion.

{¶ 22} Dentel stated that after she alerted Sanders to the men's presence, he came downstairs and spoke to them "for a long time." She stated that all four men were laughing and talking, and that when Sanders left them, they all shook hands. Dentel stated that Sanders asked her to count some money, and that she did so behind the bar, out of the patrons' observation. She stated that the amount of money was four thousand dollars, and that she told Sanders to take it upstairs, and that he did so after putting it in his rear pocket.

{¶ 23} Dentel stated that Simpson twice more approached the bar, buying three beers each time. Shortly before 4:00 a.m., Dentel testified that "Hank came back downstairs. And as soon as he came to the main bar, [Simpson] ran up to him and said 'Hank, give me your money.' And Hank turned around and he just shot him." Dentel stated that Sanders grabbed his groin area and fell to the floor, and that Simpson then pointed his gun at her and said, "'bitch, give me the money.'" Dentel told Simpson that the money was behind the bar, and he took the cash from a box there. She stated that Simpson took about $250.00 from behind the bar.

{¶ 24} Dentel stated that she observed the other two young men with weapons and that they were "pointing them at everybody telling everybody to be quiet and get down." She stated that the three men had been in the bar for an hour and a half to two hours before they showed their weapons. She stated that she heard a second shot, and that the men then "went upstairs and they shot their gun while they were going upstairs and told everybody not to move." Dentel stated that she ran to the nearby home of Sanders' sister and told her to call the police. When

she returned to the basement, she stated that she observed Sanders "bleeding to death," and that he lifted his head and told her that he loved her. She also observed Carter, who had been shot in the head and "wasn't alive." Dentel stated that after Sanders spoke to her, "the police grabbed me and told me to come and sit in his cruiser." She stated that she was cooperative with the officers, and that she went to the police station to be interviewed.

{¶ 25} When the prosecutor asked Dentel about the photo spread identifications, counsel for Simpson objected on the basis of the failure to comply with the blind/blinded administrator requirement, and the court overruled the objection. Dentel's testimony regarding her immediate identification of Simpson in the photo spread as the man who "shot Hank" was consistent with Gaier's at the suppression hearing.

{¶ 26} On cross-examination, Dentel stated that she used cocaine about every two hours on the the evening of December 13th, and that she and Sanders did so because "it mainly made us stay up and see who was coming to the basement and socialize with people and stuff like that. It don't make us crazy or anything like that." Dentel stated that her common practice was to put the money she received bartending into her bra, until she "had too much money to put in there and I would put it in the box" behind the bar. She stated that Simpson did not remove his hat in the course of the incident. She stated that there were approximately 15 people in the bar when the incident occurred. She stated that Simpson was "over by the [main] bar" when he shot Sanders, and that the other two were "over by the small bar." She stated that she did not know if the other patrons gave money to the other two men with guns, and that she "wasn't looking around because I had a gun on myself. I was looking at the person with the gun on me." Dentel stated that everyone in the bar was drinking alcohol, with the exception of Sanders.

{¶ 27} Officer Joseph Heyob of the Dayton Police Department testified that he was alone on routine patrol at the time of the incident, and that he was the first responding officer to enter the basement. He stated that Dentel was eventually placed in his cruiser, and he described her as "very emotionally distraught. She appeared upset but she was very cooperative and actually very helpful." The following exchange occurred:

Q. Helpful in what way?

A. Just pointing to where people were. And she kept her - - she was obviously upset but she kept her cool, in a way. I mean she didn't - -wasn't a problem or distraction and she didn't interfere with what we needed to do.

{¶ 28} Erika Peek testified that Carter was her cousin, and that on the morning of the incident, the two of them went to Hank's after they went to two other bars. She stated that at one of the bars, they saw "Esko," a deejay there, and Brandon Fields. She stated that she and Carter followed the men to Hank's, and that they each had two drinks prior to their arrival there. Upon arrival, Peek stated that Carter went to the bathroom, and then the women sat down at a table in the middle of the room, next to Annette Dillard, a friend of Peek's, and across from Esko and Fields. While the group talked around the table, Peek stated that "the next thing you know, somebody stands up and says 'this is a fucking robbery, give us your fucking money.' * * * And then he shot Hank for no reason." Peek stated that "some guy" asked her for her money, and that she did not have any money but she gave him her purse. She stated that Carter "just fell out of her seat." Peek stated that Simpson shot Sanders.

{¶ 29} On cross-examination, Peek estimated that she and Carter arrived at Hank's at 2:30 a.m. At that time, she stated that Simpson was sitting at the small bar with another man,

and another young man was sitting at the main bar. Peek testified that she was unaware that the three men were together until the robbery occurred. She stated that she noted their presence because they were younger than everyone else. Peek described the bar area as small, and she stated that she "could view everyone. It's kind of tight." She stated that the maximum time that passed between her and Carter's arrival and the robbery was 20 minutes. She stated that the man at the main bar wore khaki pants and was fair skinned, and that he approached her and demanded her money in the course of the robbery. She stated that she did not observe a weapon in his possession. When asked if the person at the main bar who took her purse was at that bar the entire time, Peek replied, he "could have moved when I was looking at the pictures on the wall." When asked if the two men sitting at the small bar remained in the that area until the robbery occurred, Peek again stated, "I can't be for sure if they got up when I was looking at pictures." Peek, identifying Simpson in the courtroom, stated that on the date of the incident, "he had something on his head," that he had "braids," or "dreads," and that he wore dark clothing. Peek referred to Simpson as the "killer," and she stated that she observed a "black gun" in his possession. Peek stated that she observed Simpson shoot Hank. Finally, on redirect, Peek acknowledged that she was emotional and distraught after the shooting, and that her description of the incident to police may not have been entirely accurate, but she stated that she was "a hundred percent sure" that she saw Simpson fire a weapon.

{¶ 30} Gregory Gaier described the police department's policy and procedures for compiling photo spreads in a manner consistent with Rose's description at the suppression hearing. Gaier stated that the requirement for a blind/blinded administrator does not apply to federal prosecutions. Gaier stated that at the time the photo spreads herein were being

administered, he believed that Simpson would be federally prosecuted. Gaier stated that the investigators attempted to administer the photo spreads "as quick as possible to all the witnesses just, by chance, they would not have contact with each other and * * * let each other know that they had made identifications in the case." He stated that the investigators were divided into three separate teams to efficiently administer the photo spreads. Gaier's description of the administration of the photo spread to Dentel, including his omission of the instruction that he did not know the suspect's identity, and her immediate and unwavering selection of Simpson in photo number 2 as the "the one that shot Hank," was consistent with his testimony at the suppression hearing, as was his testimony that she identified Moon and Norvell. Gaier stated that he obtained a DNA standard from Simpson on December 28, 2010, by means of an oral swab.

{¶ 31} On cross-examination, Gaier stated that the purpose of the blind/blinded administrator requirement is to "to avoid any possibility of contamination of the showing of a photo spread." He stated that he omitted the instruction that he did not know Simpson's identity "because I knew who the suspect is." Gaier stated that the photo spreads were compiled by means of JusticeWeb, the photos were in color "to show a good, true, accurate complexion," they were placed in random positions by the computer, the individual defendants were in positions distinct from each other among the photo spreads, and the photo spreads were administered almost simultaneously to avoid any possible conversation among the witnesses.

{¶ 32} Annette Davis testified that she is a forensic scientist with the Miami Valley Regional Crime Laboratory with 22 years of experience. She identified State's Exhibits 53A and 53B, bottles of Bud Ice retrieved from the crime scene, and she stated that Simpson's DNA

was found on both bottles.

{¶ 33} Rose testified that the day after the incident, she received a Crime Stopper tip that David Cokes and Sammie Phillips were potential suspects in the robbery, and she compiled photo spreads for each of them. She stated that the physical descriptions of the men did not match those provided by the witnesses to the shooting. Rose stated that she administered the photo spreads to Dentel, and that they did not contain photos of Simpson, Moon or Norvell. Rose testified that Dentel did not identify any one in the photo spreads. Rose's testimony regarding her compilation of the defendants' photo spreads was consistent with her testimony at the suppression hearing, and she emphasized, "I want my fillers to look like my suspect. I want to make it hard for my victims and witnesses to pick out the suspect."

{¶ 34} On cross-examination, Rose stated that she learned that the defendants would not be federally prosecuted in April, 2011. She stated that she and Detective Mike August interviewed Simpson on December 28, 2010 at the Safety Building after advising him of his rights. She stated that the interview began at 10:50 a.m. and ended at 12:12 p.m.

{¶ 35} Kevin Phillips provided testimony consistent with his testimony at the suppression hearing regarding his and Agent's Buzzard's administration of the photo spreads to Peek and Dillard, as well as those witnesses' unwavering identification of Simpson, and Dillard's identification of Norvell, in the absence of suggestion or confirmation by the officers. On cross-examination, Phillips stated that he read the instruction to the witnesses that he did not know the identity of the suspects, although he knew the identities of the defendants.

{¶ 36} Annette Dillard testified that she manages the kitchen at a local club in Dayton from 9:00 p.m. until at 2:00 a.m., and that she left the club around 3:30 a.m. on November 14,

2010. She stated that when her shift ended, she remained at the club to have a drink. She stated that Marva Clemmons is a bartender at the club, and that the two of them went to Hank's together. Dillard stated that Hank's "is like home. I mean I felt comfortable. I've been going there on and off for years and it's an older crowd, very comfortable, everybody works. We go there after work." Dillard stated that she and Clemmons arrived at about 3:45 a.m. on the night of the incident. Dillard stated that upon arrival, she observed Dentel, whom she knows as "Twiggy," behind the bar, as well as Peek, with Carter. She stated that she also observed Joel Kimball by the bar near Dentel, and Terrence Jones, whom she recognized as a deejay named Esko from another bar. She stated that Jones and another man were sitting with Peek and Carter. Dillard stated that she also observed three men whom she did not know, who appeared to be in their twenties.

{¶ 37} Dillard stated that she started to speak to the three young men, but Dentel called her name, and she approached the bar where Dentel was working. She stated that she observed Simpson when she came down the steps into the bar sitting at the small bar, and that she looked at his face as she passed him. She stated that he was wearing a cap and that his hair was braided. Dillard stated that of the three young men, Simpson had the darkest complexion. Dillard stated that she ordered a drink from Dentel and then sat down at a table. Dillard stated that Hank came downstairs, and Joseph Barney, Brian Whiteside and Cornelius Foster entered the bar. Shortly thereafter, she stated, Simpson "was coming towards the bar area shooting at Hank at the same time." Dillard stated that she then observed Simpson point his gun at and demand money from Dentel, and also approach Barney for money. She stated that she heard a second shot and Simpson ordered everyone to the floor and demanded their money. Dillard stated that while she

was on the floor, one of the young men "snatched" her money from her hand, and he also took money from Clemmons. She stated that she observed weapons in the hands of the other two young men. She stated that the defendants fled after firing one more shot. Dillard stated that she determined that Carter was dead and approached Hank, and she then called 911 on her cell phone. Dillard's testimony regarding the administration of the photo spreads and her identification of Simpson and Norvell was consistent with that of Phillips.

{¶ 38} At the conclusion of the trial, the court provided the jury with several definitions, pursuant to R.C. 2933.83, relative to the administration of a photographic lineup. The court advised the jury that R.C. 2933.83 requires law enforcement agencies to adopt specific procedures for administering photographic lineups, and the court enumerated those procedures. The court then advised the jury in part as follows:

> The court has concluded – and you are so informed – that the failure to conduct the photo lineups with a blind or blinded administrator violated Section 2933.83. In determining the reliability of the eyewitnesses in this case, you the jury, may consider the noncompliance with the requirements of Section 2933.83 in conducting the photo lineups.
>
> You may also consider that this Court has previously ruled that both the procedure Detective Rose used to create the photo lineup and the procedure used by police officials to show that photo lineup to the witnesses complied with the requirements of the United States Constitution and the Constitution of the State of Ohio.
>
> Additional things you may consider in weighing the testimony of an

identifying witness are [the] capacity of the witness and the opportunity of the witness to observe; the witness' degree of attention at the time he observed the offender; the accuracy of the witness' prior description or identification, if any; * * * whether the witness had an occasion to observe the defendant in the past; the interval of time between the event and the identification and all surrounding circumstances under which the witness had identified the defendant including deficiencies, if any, in the photo lineup.

If after examining the testimony of the witnesses, you are not convinced * * * beyond a reasonable doubt the defendant is the offender, you must find the defendant not guilty.

{¶ 39} Simpson asserts three assignments of error herein. His first assigned error is as follows:

"TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS IDENTIFICATION BECAUSE THE IDENTIFICATION WAS UNRELIABLE."

Simpson asserts that Rose failed to comply with R.C. 2933.83, and that her "extreme noncompliance warrants suppression of [his] identification." Simpson notes that Rose failed to use a blind or blinded administrator, that she and Gaier only read partial instructions to each witness, omitting the sentence that they did not know the suspect's identities, and that Phillips "read the instruction that he did not know the suspect, despite that being untrue."

Simpson further asserts that the factors set forth in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), justify suppression. In addition to failing to comply with R.C. 2933.83, Simpson asserts that Rose "admitted that she wanted Appellant to be convicted for his

offense." Simpson asserts that Rose should have covered Simpson's unique scar when she assembled the photo spreads, and that in failing to do so, she singled out his photo.

{¶ 40} Finally, Simpson asserts that "the jury should have been given a more explicit instruction as to the inherent unreliability of the identification by the witnesses due to the number of procedural and statutory errors present in the identification." Simpson asserts that the court "mislead the jury that the procedures, while not followed, were appropriate and dissuaded the jury from considering the failures of law enforcement when judging the credibility of the witnesses." Simpson asserts that the jury should have been instructed as follows:

[T]his court has found that law enforcement failed to comply with R.C. 2933.83. Specifically, law enforcement failed to use a blind administrator, or a blinded administrator. Their failure to do so is not based upon impracticality, and they failed to put into writing the impracticalities of using a blind/blinded administrator. You may consider each of the provisions of R.C. 2933.83 for which the law enforcement failed to comply in assessing the reliability of the lineup procedure, and the credibility of the eyewitnesses who identified Appellant pursuant to the faulty procedures. If you believe the lineup was suggestive, or otherwise so flawed as to deem it unreliable, you may consider this when analyzing the credibility of the eyewitness identification.

{¶ 41} As this Court has previously noted:

"Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted) . At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of

the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence."

*State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990.

*State v. Purser*, 2d Dist. Greene No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

{¶ 42} R.C. 2933.83, which became effective on July 6, 2010, provides in relevant part as follows:

(A) As used in this section:

(1) "Administrator" means the person conducting a photo lineup or live lineup.

(2) "Blind administrator" means the administrator does not know the identity of the suspect. "Blind administrator" includes an administrator who conducts a photo lineup through the use of a folder system or a substantially similar system.

(3) "Blinded administrator" means the administrator may know who the suspect is, but does not know which lineup member is being viewed by the eyewitness. "Blinded administrator" includes an administrator who conducts a photo lineup through the use of a folder system or a substantially similar system.

* * *

(B) Prior to conducting any live lineup or photo lineup on or after the effective date of this section, any law enforcement agency or criminal justice entity in this state that conducts live lineups or photo lineups shall adopt specific procedures for conducting the lineups. The procedures, at a minimum, shall impose the following requirements:

(1) Unless impracticable, a blind or blinded administrator shall conduct the live lineup or photo lineup.

(2) When it is impracticable for a blind administrator to conduct the live lineup or photo lineup, the administrator shall state in writing the reason for that impracticability.

(3) When it is impracticable for either a blind or blinded administrator to conduct the live lineup or photo lineup, the administrator shall state in writing the reason for that impracticability.

(4) The administrator conducting the lineup shall make a written record that includes all of the following information:

(a) All identification and nonidentification results obtained during the lineup, signed by the eyewitnesses, including the eyewitnesses' confidence statements made immediately at the time of the identification;

(b) The names of all persons present at the lineup;

(c) The date and time of the lineup;

(d) Any eyewitness identification of one or more fillers in the lineup;

(e) The names of the lineup members and other relevant identifying information,

and the sources of all photographs or persons used in the lineup.

(5) If a blind administrator is conducting the live lineup or the photo lineup, the administrator shall inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know who the suspect is.

(C) For any photo lineup or live lineup that is administered on or after the effective date of this section, all of the following apply:

(1) Evidence of a failure to comply with any of the provisions of this section or with any procedure for conducting lineups that has been adopted by a law enforcement agency or criminal justice agency pursuant to division (B) of this section and that conforms to any provision of divisions (B)(1) to (5) of this section shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup.

(2) Evidence of a failure to comply with any of the provisions of this section or with any procedure for conducting lineups that has been adopted by a law enforcement agency or criminal justice agency pursuant to division (B) of this section and that conforms to any provision of divisions (B)(1) to (5) of this section shall be admissible in support of any claim of

eyewitness misidentification

resulting from or related to the lineup

as long as that evidence otherwise

is admissible.

(3) When evidence of a failure to comply with any of the provisions of this section, or with any procedure for conducting lineups that has been adopted by a law enforcement agency or criminal justice agency pursuant to division (B) of this section and that conforms to any provision of divisions (B)(1) to (5) of this section, is presented at trial, the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification resulting from or related to the lineup.

**{¶ 43}** As this Court noted in *State v. Taylor*, 2d Dist. Montgomery No. 22232, 2008-Ohio-6048, ¶ 12:

"In order to justify suppressing a pretrial identification, a defendant must demonstrate (1) that the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification, and (2) that the identification in fact was unreliable under the totality of the circumstances. *State v. Gooden*, Montgomery App. No. 19231, 2003-Ohio-905; *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401. In other words, even if an identification procedure was overly suggestive, the identification remains admissible if sufficient evidence of reliability exists. A determination of reliability is unnecessary, however, where an identification procedure was not

unduly suggestive. *State v. Glass* (March 9, 2001), Greene App. No.2000 CA 74."

    *State v. Green*, Montgomery App. No. 19224, 2003-Ohio-5744, ¶ 5.

If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility * * * . *State v. Parrish*, 2d Dist. Montgomery No. 21091, 2006-Ohio-2677, ¶ 35.

{¶ 44} We note that *Biggers* involved a station house show-up identification, and the *Biggers* Court determined:

> the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id*., 199.

{¶ 45} We note that on February 8, 2013, this Court affirmed the judgment of the trial court relating to Earl Moon who, like Simpson, asserted on appeal that the trial court erred in overruling his motion to suppress eyewitness identification evidence. *State v. Moon*, 2d Dist. Montgomery No. 25061, 2013-Ohio-395. Therein we noted as follows:

> Significantly, although R.C. 2933.83(C)(1) provides that the trial court must consider non-compliance with the provisions of the statute in adjudicating a motion to suppress eyewitness identification testimony, it does *not* provide that non-compliance, by itself, requires suppression of the testimony. In dictum, we have said that the "penalty" for failure to comply with the statute is not

suppression, but the other remedies provided for in the statute. *State v. Stevenson*, 2d Dist. Montgomery No. 24821, 2012-Ohio-3396, ¶ 16, citing *State v. Ruff*, 1st. Dist. Hamilton No. C-110250, 2012-Ohio-1910, which, at ¶ 7, holds that the statute "does not provide an independent ground for suppression[.]" *Moon*, ¶ 28.

**{¶ 46}** As we did in *Moon*, we find that the failures of the officers to comply with R.C. 2933.83, does not, by itself, require suppression of the evidence and, as in *Moon,* the issue is then "whether the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Moon*, ¶ 30, citing *Taylor* and *Biggers*.

**{¶ 47}** We initially note that the trial court found the testimony of the witnesses at the suppression hearing to be credible, and we defer to the trial court's assessment of credibility and conclusion that the officers did not in any way suggest Simpson's identity to any of the witnesses. Rose stated that she used the JusticeWeb system to randomly select photos of men with similar identifiers, and that she selected five photos "who I feel are like and similar to Simpson." Of the 12 witnesses who viewed Simpson's photo spread, three witnesses could not identify Simpson, and one identified Simpson and another individual and could not make a definitive identification between them, supporting Rose's assertion that she chose photos with identifiers similar to those of Simpson. Rose put each suspect's photo in a different position in the arrays to discourage the focus on one position. The identifications were conducted primarily in one day, and the witnesses were instructed not to discuss their identifications with other witnesses. The administrators did not confirm any of the identifications, although the statue permits confirmation after the photo lineup is completed.

{¶ 48} Finally, the color photo-spread used to identify Simpson is before us, and we have examined it. The filler photographs are similar to Simpson's. While Simpson's photo reveals an uneven hairline, the hairlines in the other photographs are as Rose described at the suppression hearing, and we conclude that the trial court correctly concluded that the photo spread was not unduly suggestive, despite "the particular difficulties created by Mr. Simpson's hairline."

{¶ 49} As did the trial court, and as did this Court in *Moon*, we conclude that the procedure used in administering the photo-spreads in this case, while not in compliance with R.C. 2933.83, was "not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification" and that, accordingly, we need not proceed to the second step of the analysis, namely "whether the identifications were unreliable under the totality of the circumstances." *Moon*, ¶ 35.

{¶ 50} As to Simpson's argument regarding the jury instructions, we note that counsel for Simpson did not propose an alternative instruction at trial. The court instructed the jury, in accordance with the mandate in R.C. 2933.83(C)(3), that it may consider the administrators' noncompliance with the statute. Pursuant to Ohio Jury Instructions, section 409.05(5), since the identification procedure used by the administrators was not unduly suggestive such that due process concerns are implicated, the court correctly instructed the jury that any remaining questions of reliability go to the weight to be given to the identification. There being no merit to Simpson's first assigned error, it is overruled.

{¶ 51} Simpson's second assigned error is as follows:

"THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO

SUPPRESS HIS STATEMENTS AS HIS MIRANDA WARNINGS WERE IMPROPERLY ADMINISTERED, RENDERING HIS STATEMENTS INADMISSIBLE."

**{¶ 52}** Simpson asserts that the "manner of the interrogation renders any waiver involuntary, unintelligent and coerced," and that his *Miranda* warnings "were stale." He directs our attention to *State v. Waldo*, 2d Dist. Montgomery No. 99CA24, 2001-Ohio-1349, (2001 WL 1103330). Therein we noted as follows:

A suspect's decision to waive his Fifth Amendment privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. *State v. Otte* (1996), 74 Ohio St.3d 555; *State v. Petitjean* (2000), 140 Ohio App.3d 517. Coercive police activity is a necessary predicate to finding a confession involuntary within the meaning of the Due Process Clause of the Fourteenth Amendment. *State v. Wiles* (1991), 59 Ohio St.3d 71.

The voluntary nature of a defendant's statement is determined from the totality of the circumstances. *State v. Slagle* (1992), 65 Ohio St.3d 597; *State v. Treesh* (2001), 90 Ohio St.3d 460. A confession is involuntary if, on the totality of the circumstances, the defendant's will was overborne by the circumstances surrounding his giving of the confession. *Dickerson v. United States* (2000), 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405; *Petitjean*, *supra*.

The totality of the circumstances test takes into consideration both the characteristics of the accused and the details of the interrogation. *Petitjean, supra*. Factors to be considered include the age, mentality and prior criminal experience

of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *State v. Edwards* (1976), 49 Ohio St.2d 31. Use of deceit by the interrogating police officers and misrepresentations made to the suspect about the evidence police possess do not *per se* render a confession involuntary, *per se.* Rather, it is but one factor bearing on voluntariness. *State v. Cooey* (1989), 46 Ohio St.3d 20.

\* \* \*

Whether an accused's confession was voluntary for purposes of the Fifth Amendment presents a question of law. An appellate court reviews that issue de novo, not being bound by the trial court's judgment on the same legal issue. The appellate court must give strong deference to the trial court's findings of the facts which underlie a claim of involuntariness.   *Waldo*, \* 3, \*4.

**{¶ 53}**   This Court further noted in *Waldo* as follows:

*Miranda* warnings do not foreclose a further inquiry whether a defendant's will was overborne by the circumstances surrounding the giving of a confession. \* \* \*.   The focus of that inquiry is whether police overreaching during the interrogation process was such as to overbear the defendant's will to resist and bring about a confession which is involuntary because it was not freely self-determined. \* \* \* .   *Waldo*, \*4.

**{¶ 54}**   Waldo appealed from his conviction on two counts of attempted rape, and this Court  determined that his "incriminating statements were rendered involuntary by conduct which constitutes police overreaching."   *Id*.   Waldo's interrogation began at 4:30 a.m., and he

was questioned for an hour. At the time, he was intoxicated, tired and disoriented. The police refused his request to use the bathroom for eight to ten minutes, after he stated that he "had a strong need to urinate, having been drinking the night before." *Id.* An officer lied to Waldo, stating that a "'hand test'" could "be used to prove that he had contact with the victim." This Court concluded that, given Waldo's "persistent denial of any recollection of what had happened, the particular deceit police used in this instance had the capacity to persuade him that *maybe* their accusations were true, even if he did not know whether they were." *Id*., * 5. Finally, Waldo was 20 years old and "had no prior contact with the criminal justice system." *Id*. This Court concluded, under the totality of the circumstances, that Waldo's statements were involuntary, that "their use by the State to convict him was a violation of his rights of due process guaranteed by the Fourteenth Amendment," and that the trial court accordingly erred in denying Waldo's motion to suppress.

{¶ 55}   Regarding the alleged staleness of the *Miranda* warnings, this Court previously noted:

"Because custodial interrogation is inherently coercive, incriminating statements which are the product of such questioning are not admissible unless [*Miranda*] warnings precede that questioning. *Miranda v. Arizona* (1966), 384 U.S. 436. Those warnings are indispensable in overcoming the pressures of custodial interrogation and insuring that the individual knows he is free to exercise his right to remain silent at that time. Id. This suggests that the warnings should be sufficiently proximate in time and place to any interrogation so as to preserve the relief from custodial pressures that the warnings are intended to create. *State v.*

*Butler* (September 18, 1998), Montgomery App. No. 16852, unreported. When an individual to whom prior [*Miranda*] warnings were properly given is subsequently interrogated without being re-advised of his [*Miranda*] rights, the critical issue is whether that individual nevertheless remained aware of his rights at the time of the subsequent interrogation. [*Butler, supra*.] In making that determination, courts must consider the totality of the circumstances, including:

"(1) [T]he length of time between the giving of the first warnings and subsequent interrogation, * * * (2) whether the warnings and the subsequent interrogation were given in the same or different places, * * * (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers, * * * (4) the extent to which the subsequent statement differed from any previous statements; * * * [and] (5) the apparent intellectual and emotional state of the suspect. *State v. Roberts* (1987), 32 Ohio St.3d 225, 232."

*State v. Parrish*, 2d Dist. Montgomery No. 21091, 2006-Ohio-2677, ¶ 26-27.

**{¶ 56}** Gaier interviewed Simpson regarding the unrelated robbery after advising him of his rights at 11:37 p.m. on December 27, 2010, following his arrest, and he defined the word "coercion" for him. Simpson initialed each right to indicate his understanding thereof, and Gaier stated that Simpson agreed to speak to him and Ritchey. The interview lasted over half an hour. Just 25-45 minutes thereafter, Gaier assisted Ferguson in interviewing Simpson, and he testified that Ferguson ascertained from Simpson that he understood his rights as previously read to him at the start of the interview, and that Ferguson advised him that the interview pertained to the instant matter. Gaier stated that the second interview lasted "around 20 minutes," and that

Simpson was offered water and restroom breaks, and that he was cooperative and coherent. Gaier stated that Simpson did not ask for a break or indicate fatigue in either interview, and that he did not ask for an attorney. Gaier stated that neither threats nor promises were made to Simpson in exchange for his statements.

{¶ 57} Rose made clear that in her interview of Simpson on December 28, 2010, which occurred at 10:50 a.m., that Simpson was offered water and an opportunity to use the bathroom. Simpson indicated to her that he had previously been read his rights. Rose read each right to Simpson, which he individually initialed to indicate his understanding thereof. She read the waiver of rights, and she defined the term "coercion" for him. The interview lasted for an hour and twenty-two minutes. Having thoroughly reviewed the record, we conclude that there is nothing herein to suggest police overreaching, or that Simpson's will was overborne, as in *Waldo*.

{¶ 58} Finally, regarding Simpson's *Miranda* warnings, it is clear that he was initially advised of his rights by Gaier, Ferguson ascertained Simpson's understanding thereof before proceeding with the second interview shortly thereafter, and Rose thoroughly advised Simpson of his rights again the following day. In other words, Simpson's *Miranda* warnings were sufficiently proximate in time and place to his interrogations. There being no merit to Simpson's second assigned error, it is overruled.

{¶ 59} Simpson's third assigned error is as follows:

"APPELLANT'S CONVICTIONS WERE NOT SUPPORTED BY THE EVIDENCE."

{¶ 60} Simpson asserts that the trial court erred in overruling his Crim.R. 29 motion for acquittal "as there was insufficient evidence to support a conviction of murder and aggravated

robbery," and that his convictions "were against the manifest weight of the evidence." Specifically, Simpson asserts that inconsistencies in the testimony of Dentel, Peek and Dillard "affected the sufficiency of the evidence."

**{¶ 61}**   As this Court has previously determined:

A Crim.R. 29 motion for judgment of acquittal challenges the legal sufficiency of the evidence. *State v. Carter*, Montgomery App. No. 21145, 2006-Ohio-2823, ¶ 40. When considering such a motion, a trial court must construe the evidence in a light most favorable to the State and determine whether reasonable minds could reach different conclusions about whether the evidence proves each element of the offense charged beyond a reasonable doubt. If a rational trier of fact could find the essential elements of the crime to be proven beyond a reasonable doubt, a defendant is not entitled to acquittal under Crim.R. 29. *Carter*, supra, at ¶ 41.   *State v. Turic*, 2d Dist. Montgomery Nos. 21453, 21454, 2006-Ohio-6664, ¶ 13.

**{¶ 62}**  As this Court has further previously noted:

When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." * * * A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the

evidence weighs heavily against the conviction." * * * *State v. Hammock*, 2d Dist. Montgomery No. 24664, 2012-Ohio-419, ¶ 12.

**{¶ 63}** R.C. 2911.01 provides:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; . . . .

**{¶ 64}** R.C. 2903.02(B) provides: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

**{¶ 65}** While we agree that there were inconsistencies in the testimony of the above witnesses regarding for instance the locations of the three young men within the bar, the time of the shooting, and the language used by the men, these differences did not require the jury to discredit the witnesses' testimony that Simpson participated in the robberies and murders of Sanders and Carter at Hank's. Dentel, although acknowledging her drug and alcohol usage, recollected many facts consistent with other witnesses, and she was within arm's length of Simpson when she served him bottles of Bud Ice three separate times. Annette Davis testified that Simpson's DNA was found on two bottles of Bud Ice retrieved from the crime scene. Dentel stated that Simpson shot Sanders, pointed a gun at her, and took money from behind the bar. She

stated that she was focused on Simpson when he pointed the gun at her. Officer Heyob described Dentel as "very helpful" after the shooting, and he stated that she "kept her cool." Gaier stated that Dentel's pretrial identification of Simpson in the photo spread as "the one who shot Hank" was immediate and unwavering. Gaier testified to the manner in which the photo spreads were assembled, randomly, by means of JusticeWeb, with color photos, as well as their almost simultaneous administration, so as to prevent eyewitnesses from consulting with one another. Rose stated that she chose photos that resembled the suspects for the photo spreads in an attempt to make identification difficult, and as noted above, Simpson's photo spread supports Rose's testimony.

{¶ 66} Peek also stated that she observed Simpson shoot Sanders. When asked about the location of the three young men within the bar in the course of the incident, Peek acknowledged that she was looking at pictures on the wall and that, while her version of the details of the incident may not have been entirely consistent with other witnesses, she was "a hundred percent sure" that she saw Simpson fire a weapon. We note that State's Exhibits 30, 33 and 36, which are photos of the bar area, reveal a cramped space and walls covered in photographs. Peek's testimony was consistent with Dentel's regarding Simpson's dark clothing, hairstyle and hat. Phillips stated that Peek's pretrial identification of Simpson in the photo spread was unwavering.

{¶ 67} Dillard testified that she passed Simpson on her way to the main bar, and that she looked at his face as she did so. Her testimony regarding his complexion, hat and hairstyle was consistent with Dentel's and Peek's. She also stated that she observed Simpson shoot Sanders and demand money from Dentel, as well as Barney, and that Simpson ordered everyone to the

floor and demanded their money. Phillips stated that Dillard's pretrial identification of Simpson was unwavering.

**{¶ 68}** Having reviewed the entire record, we conclude that the evidence herein does not weigh heavily against conviction, and that Simpson's conviction is supported by sufficient evidence. Simpson's third assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J., concurs.

FROELICH, J., concurring:

**{¶ 69}** The trial court gave the general credibility instruction and Ohio Jury Instruction 409.05(5) regarding eyewitness testimony. The court also used the language of R.C. 2933.83(C)(3) to inform the jury that the failure to use a blind or blinded administrator violated that section and that the jury could consider the noncompliance in determining the reliability of the eyewitnesses.[2] However, the court further instructed the jury that the "procedure used by police officials to show that photo line-up to the witnesses complied with the requirements of the United States Constitution and the Constitution of the State of Ohio."

**{¶ 70}** The intent of R.C. 2933.83 is to help ensure that the accused is convicted based on eyewitness identification only if the eyewitness testimony should be believed beyond any reasonable doubt. *See*, *e.g.*, *United States v. Smithers*, 212 F.3d 306 (6th Cir.2000) for a discussion of the "dangers" of eyewitness identification. However, the mere incantation that the

---

[2] Consistent with R.C. 2933.83, 2 *Ohio Jury Instructions*, Section 409.05(6) (2012) states that the jury may consider noncompliance with live or photo lineup procedures, but those instructions had not been adopted when Simpson was tried.

jury may consider noncompliance is illusory; without additional information as to why that noncompliance is relevant, such an instruction has questionable force. Moreover, the court's subsequent statement that the court has determined that the procedures complied with the Constitution could render even that instruction meaningless in the mind of the average jury.

{¶ 71} The jury was not told why the legislature mandates the use of a blind or blinded administrator or how non-compliance could affect the reliability of the eyewitness identification, only that this non-use was somehow in violation of some statute. And then it was told, in essence, that it is all okay because the judge found it complied with the Constitution.

{¶ 72} At the same time, it is not required in our adversary system that the court, especially absent a supportable, requested instruction, educate the jury on the science underlying R.C. 2933.83. Ideally, if warranted, the accused would call an expert on eyewitness reliability or otherwise bring the rationale for R.C. 2933.83 to the jury's attention. The State of Maryland's highest court noted that "expert testimony is not the only means to educate juries about the vagaries of eyewitness testimonies and safeguard against wrongful convictions based on misidentification." *Bomas v. State*, 412 Md. 392, 987 A.2d 98 (2010). The *Bomas* court even suggested that Maryland evaluate its current pattern jury instructions involving eyewitness testimony "in light of the studies about eyewitness testimony, and the separate advances in the area," as other states have done. *Id.* at 418. *See*, *e.g.*, N.J. Crim. Model Charges, *Identification* (effective Sept. 4, 2012).

{¶ 73} But it takes a leap of faith that our legal argot – e.g., the difference, if any, among trustworthiness, reliability, credibility, and believability, or the difference between a statutory and constitutional requirement – is truly appreciated by a jury.

**{¶ 74}** Nonetheless, the court complied with the law, and I concur in the affirmance.

. . . . . . . . . .

Copies mailed to:

Kirsten A. Brandt
Jon Paul Rion
Nicole Rutter-Hirth
Hon. Michael L. Tucker