[Cite as *State v. Harmon*, 2017-Ohio-8106.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   26883 |
| | : | |
| v. | : | T.C. NO. 13-CR-2844 |
| | : | |
| BRADLEY A.T. HARMON | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___6th___ day of _____October_____, 2017.

. . . . . . . . . .

MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

CARL BRYAN, Atty. Reg. No. 0086838, 120 W. Second Street, #603, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Bradley A. T. Harmon appeals his conviction and sentence for one count of aggravated burglary, in violation of R.C. 2911.11(A)(2), a felony of the first degree; one count of felonious assault, in violation of R.C. 2903.11(A)(1), a

felony of the second degree; one count of grand theft, in violation of R.C. 2913.02(A)(1), a felony of the third degree; one count of tampering with evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree; and one count of robbery, in violation of R.C. 2911.02(A)(1), a felony of the second degree. Harmon's convictions for aggravated burglary and felonious assault were accompanied by mandatory three-year firearm specifications. Harmon filed a timely notice of appeal with this Court on October 23, 2015.

{¶ 2} The incident which forms the basis for the instant appeal occurred on September 7, 2013, at a residence located in Huber Heights, Ohio. The victim, D.M., lived at the residence with her great-grandparents, N.M. and R.M. D.M. was twelve years old at the time that the incident occurred. In the early morning hours of September 7, 2013, D.M. was sleeping in her bedroom with her friend, C.M. (no relation), who was there for a sleepover. At some point between 5:00 a.m. and 6:00 a.m., D.M. woke up when she felt something brush the left lower part of her face. Initially, D.M. assumed it was one of her six cats who often slept in her room. Shortly thereafter, D.M testified that she heard a loud noise and she sat up from where she had been sleeping on the floor next to her bed. When she sat up, D.M. observed a "black figure" standing at her door. Although she testified that she did not recognize the individual, D.M. was able to perceive that the person was a young white male with light colored hair wearing a hoodie that was not covering his face. D.M. testified that she was therefore able to observe the individual's face. D.M. testified that she was able to see the individual standing at her door because her television was turned on and was shining light in his direction.

{¶ 3} After observing the individual, D.M. testified that she looked around and

observed blood all over herself. D.M. testified that the individual addressed her, stating "you're welcome." The individual took one of D.M.'s t-shirts off of a bean bag chair, left her room, and then ostensibly fled from the residence. At this point, D.M. testified that she started screaming. C.M. woke up immediately, observed the blood on D.M., and began screaming as well. Awoken by the girls' screaming, N.M. walked into the hallway to check on them. N.M. observed that D.M. was bleeding and immediately called 911.

{¶ 4} Shortly thereafter, Officer Robert Gibbs of the Huber Heights Police Department responded to the 911 call at D.M.'s residence. Upon arriving at the residence, Officer Gibbs made contact with D.M. and observed that she had what appeared to be a gunshot wound to the lower area of her left jaw. Officer Gibbs further observed that the wound had powder burns around it, suggesting that it was a contact wound. Once paramedics arrived, D.M. was transported to Children's Medical Center where she underwent emergency surgery whereby the surgeons inserted a metal plate in her jaw and wired it shut. Because it did not pose a risk at the time, the surgeons operating on D.M. decided to leave the remainder of the bullet where it had lodged itself in her lower neck after she was shot. The bullet was finally removed in November of 2014 because it caused D.M. chronic neck pain.

{¶ 5} While D.M. was in the intensive care unit (ICU) after her initial operation, Detective Mike Noll of the Huber Heights Police Department came to interview her regarding the shooting. Det. Noll administered a photospread lineup to D.M. which contained a photograph of Harmon along with five other similar looking male individuals. At trial, D.M. testified that she selected the photograph in the fifth slot because he looked "familiar." The photograph D.M. chose was of Harmon. D.M. also testified that she met

Harmon once because his mother was D.M.'s Girl Scout Troop leader. We note that D.M. further testified that she did *not* recognize her assailant as someone she knew when the shooting occurred.

{¶ 6} After the shooting, police were given the perpetrator's description provided by D.M., to wit: white male, early twenties to late teens, and blond hair. After D.M. was interviewed by Det. Noll, the police were also given Harmon's name to add to the perpetrator's description. At approximately 6:55 p.m. on September 7, 2013, Officer Brian Carr of the Huber Heights Police Department was patrolling the area near D.M.'s residence. About three-quarters of mile away, Officer Carr observed an individual matching the description provided to him. Officer Carr notified dispatch that he had just observed an individual "that was possibly Bradley Harmon." Officer Carr exited his cruiser and walked over to where the individual was standing and asked if his name was Bradley Harmon. The individual stated that he was Bradley Harmon but did not have any identification on his person. Officer Carr took Harmon into custody and transported him to the Huber Heights Police Department.

{¶ 7} Once at the police station, Harmon was interviewed by Det. Noll. Prior to answering any questions, Harmon was informed of his *Miranda* rights by Det. Noll, after which Harmon read and signed a pre-interview waiver form. In light of subsequent admissions made by Harmon, police located a .25 caliber semi-automatic handgun lying in the backyard of a residence one street over from D.M.'s residence. The handgun had a distinctive "whitish cream" colored grip. Police officers discovered a spent shell casing in D.M.'s room. Ballistics testing confirmed that the spent shell was fired from the handgun found in the backyard. Further testing revealed that D.M.'s DNA was present

on the barrel of the handgun, while a profile consistent with Harmon's DNA was present on the right and left sides of the handgun.

{¶ 8} Mary Starks testified that on September 7, 2013, she reported that someone stole a handgun out of the console of her motor vehicle where she had left it the night before. Starks testified that the handgun was a .25 caliber semi-automatic pistol with white "pearlized" grips. Additionally, investigators discovered that Harmon's fingerprints were present on the driver's side door of Starks' vehicle. Starks testified that she did not know who Harmon was prior to her involvement in the instant case. Fingerprint analysis also indicated that Harmon's prints were present on the outside handle of D.M.'s bedroom door.

{¶ 9} On September 17, 2013, Harmon was indicted for the following offenses: Count I: aggravated burglary (physical harm), in violation of R.C. 2911.11(A)(1), a felony of the first degree; Count II: aggravated burglary (deadly weapon), in violation of R.C. 2911.11(A)(2), a felony of the first degree; Count III: felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), a felony of the second degree; Count IV: felonious assault (serious harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree Count V: grand theft (firearm), in violation of R.C. 2913.02(A)(1), a felony of the third degree; Count VI: tampering with evidence (alter/destroy), in violation of R.C. 2921.12(A)(1), a felony of the third degree; and Count VII: robbery (deadly weapon), in violation of R.C. 2911.02(A)(1), a felony of the second degree. Counts I through IV were accompanied by mandatory three-year firearm specifications.

{¶ 10} At his arraignment on September 19, 2013, Harmon stood mute, and the trial court entered a plea of not guilty on his behalf. On October 16, 2013, Harmon filed

a motion to suppress the photospread identification utilized by Det. Noll, arguing that the procedure was unduly suggestive, and therefore unreliable. On November 13, 2013, Harmon filed an amended motion to suppress any statements made to police after being taken into custody. A hearing was held on said motion on February 7, 2014, and additional testimony was taken on March 24, 2014, and April 17, 2014. Thereafter, on May 21, 2014, the trial court issued a decision denying Harmon's motion to suppress in its entirety. The trial court, however, found that a significant portion of the photospread shown to D.M. was not conducted by a blind administrator as required under R.C. 2933.83. Therefore, the trial court held that the jury, if requested by counsel, would be instructed that it "may consider credible evidence of this noncompliance in determining the reliability of the eyewitness identification resulting from or related to the lineup."

{¶ 11} The case proceeded to a jury trial beginning on August 3, 2015, and lasting until August 6, 2015. Harmon was found guilty on all counts. The trial court ordered a pre-sentence investigation report (PSI) and scheduled a sentencing hearing for October 2, 2015. We note that in his PSI, Harmon stated that he shot D.M "because she deserved to be shot." Additionally, while at the Montgomery County Jail awaiting sentencing, Harmon was overheard by a corrections officer tell another inmate, "Yeah, I shot that b[****] in the face. I hope she's happy now. I'll shoot her in the teeth next time."

{¶ 12} At sentencing, the trial court merged the two counts of aggravated burglary into one count, and merged the two counts of felonious assault into one count. The State elected to proceed to sentencing on Count II: aggravated burglary (deadly weapon) and Count IV: felonious assault (serious harm), each count accompanied by a three-year

firearm specification. In addition to the remaining counts for grand theft, tampering with evidence, and robbery, the trial court sentenced Harmon to an aggregate prison term of twenty-five years and nine months.

**{¶ 13}** It is from this judgment that Harmon now appeals.

**{¶ 14}** Because they are interrelated, Harmon's first and fourth assignments of error shall be discussed together as follows:

**{¶ 15}** "THE PHOTO LINE-UP IDENTIFICATION OF APPELLANT SHOULD HAVE BEEN SUPPRESSED."

**{¶ 16}** "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL."

### A. Photospread Identification

**{¶ 17}** In his first assignment, Harmon contends that the trial court erred when it denied his motion to suppress with respect to D.M.'s identification of him from the photospread line-up administered by Det. Noll. Specifically, Harmon argues that because the photospread line-up was not presented by a blind administrator, it was impermissibly suggestive, and therefore unreliable.

**{¶ 18}** "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers,* 409 U.S. 188, 196–97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

**{¶ 19}** The defendant must first show that the identification procedure was unduly suggestive. "A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection." (Citations omitted.) *State v.*

*Adams,* 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208. If the pretrial identification procedure was not unfairly suggestive, any remaining questions as to the identification's reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Id.* at ¶ 209; *State v. Williams,* 2d Dist. Montgomery No. 26357, 2015-Ohio-1403, ¶ 13.

{¶ 20} If, on the other hand, the defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure. *Id.* In reviewing the likelihood that the circumstances resulted in a misidentification, courts consider the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Neil* at 199–200, 93 S.Ct. 375; *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Chaffin,* 2d Dist. Montgomery No. 25220, 2014-Ohio-2671, ¶ 16.

{¶ 21} Reliability of the pretrial identification is the linchpin in determining its admissibility. *Manson* at 114, 97 S.Ct. 2243. "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls,* 2d Dist. Montgomery No. 18599, 2002 WL 254144, *3 (Feb. 22, 2002).

{¶ 22} We review a trial court's refusal to suppress a pretrial identification for an abuse of discretion. *State v. Wilson,* 2d Dist. Montgomery No. 22624, 2009-Ohio-1038, ¶ 19.

{¶ 23} In *State v. Stevenson*, 2d Dist. Montgomery No. 24821, 2012-Ohio-3396,

we stated the following:

> This assignment of error implicates R.C. 2933.83(B), which took effect in July 2010. The statute "requires any law enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt specific procedures for conducting the lineups." *State v. Ruff,* 1st Dist. Hamilton No. C–110250, 2012–Ohio–1910, ¶ 5. These procedures include, inter alia, using "a blind or blinded administrator" to conduct a photo lineup. R.C. 2933.83(B)(1). Under R.C. 2933.83(C)(1), evidence of a failure to comply with the required protocol "shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup." The First District Court of Appeals has held, however, that "R.C. 2933.83(C)(1) does not provide an independent ground for suppression, and that [a] trial court [errs] in relying solely on the statute in suppressing" an identification. *Ruff* at ¶ 7. We agree. Indeed, the "penalty" for failure to comply with R.C. 2933.83 is not suppression, but that "the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification." R.C. 2933.83(C)(3).

*Id.* at ¶ 16.

{¶ 24} Pursuant to R.C. 2933.83(A)(2), a "blind administrator" is defined as an administrator who "does not know the identity of the suspect," while a blinded administrator is defined, pursuant to R.C. 2933.83(A)(3), as an administrator who "may know who the suspect is, but does not know which lineup member is being viewed by the

eyewitness. 'Blinded administrator' includes an administrator who conducts a photo lineup through the use of a folder system or a substantially similar system." The folder system provides for the inclusion of the suspect's photograph with five "filler photographs," and four "blank photographs," which are placed into ten empty folders and shuffled; the administrator accordingly does not know which folder the witness is viewing when the array is administered. R.C. 2933.83(A)(6). The statute does not require the use of the folder system.

{¶ 25} In the instant case, the record establishes that Det. Noll created a random photospread consisting of six suspects, one of which was Harmon. Det. Noll used a computer-generated program called Justice Web, in which he enters a suspect's information, including social security number, and the program finds the suspect's photograph. The program generates a compilation of similar photographs based on the suspect's photograph. Det. Noll stated that, after entering Harmon's information, he picked five photos from those compiled by Justice Web. In its decision denying Harmon's motion to suppress, the trial court found that the six individuals selected for the photospread were all white males of similar age with similar hairstyles, hairlines, and foreheads. The trial court also found that the backgrounds in each of the six photographs were similarly bland.

{¶ 26} After preparing the photospread, Det. Noll, accompanied by Sergeant Eagan, traveled to Children's Hospital in order to administer the photospread to D.M. while she was in I.C.U. Upon arriving, Det. Noll spoke with Richard Llewellyn, a security officer at the hospital, and asked for his assistance in administering the photospread. Llewellyn, who was not aware of the identity of the suspect, agreed to assist Det. Noll.

Det. Noll and Llewellyn went into D.M.'s hospital room together. Llewellyn then read the photospread instructions to D.M. from a printed form on the first page. The instructions stated in pertinent part that the "group of photographs may or may not contain a picture of the person who committed the crime being investigated."

{¶ 27} After reading the instructions to D.M., Llewellyn handed the photospread to D.M. who, within approximately one minute, pointed to photograph five which was the picture of Harmon. Det. Noll asked D.M. whether photograph five depicted "the individual that was in her house and that had shot her." D.M. responded affirmatively and further stated that she was eighty percent sure that the suspect in photograph five was her attacker. D.M. then circled photograph five. Photograph five was a picture of Harmon. We note that D.M. also circled photograph six as well. D.M. stated that the suspect in photograph six was not the individual who had shot her, but only that he looked very familiar.

{¶ 28} On appeal, Harmon argues that the photospread was impermissibly suggestive because, although Llewellyn read D.M. the instructions and initially administered the photospread, Det. Noll was in the room the entire time, was aware of the suspect's identity, and asked D.M. questions after she identified Harmon's picture in the photospread. Simply put, Harmon contends that Det. Noll's failure to properly utilize a blind administrator rendered the photospread impermissibly suggestive, and therefore void.

{¶ 29} Initially, we note that the trial court found the testimony of Det. Noll and Llewellyn at the suppression hearing to be credible, and we defer to the trial court's assessment of credibility and conclusion that the officers did not in any way suggest

Harmon's identity to D.M. Det. Noll testified that he used the Justice Web system to randomly select photos of men with similar identifiers, and that he selected five photos of individuals who looked similar to Harmon. Neither Det. Noll nor Llewelyn confirmed D.M.'s identification of Harmon as the perpetrator, although the statue permits confirmation after the photo lineup is completed.

{¶ 30} Finally, the color photo-spread used to identify Harmon is before us, and we have examined it. The filler photographs are similar to Harmon's. Upon review, we agree with the trial court that the six individuals selected for the photospread were all white males of similar age with similar hairstyles, hairlines, and foreheads, and the backgrounds in each of the six photographs were bland and indistinguishable from one another.

{¶ 31} As we previously found under similar circumstances in *State v. Moon*, 2d Dist. Montgomery No. 25061, 2013–Ohio–395, we conclude that the procedure used in administering the photospread in this case, while not in compliance with R.C. 2933.83, was "not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification" and that, accordingly, we need not proceed to the second step of the analysis, namely "whether the identifications were unreliable under the totality of the circumstances." *Id.* at ¶ 35.

## B. Ineffective Assistance Regarding Lack of Jury Instruction on Non-Compliance With R.C. 2933.83

{¶ 32} In his second assignment, Harmon argues that his counsel was ineffective for explicitly waiving a jury instruction regarding Det. Noll's non-compliance with the blind administrator requirement set forth in R.C. 2933.83(B)(1). We note that while the trial court ultimately found that the photospread administered to D.M. was not impermissibly

suggestive, it stated in its decision overruling Harmon's motion to suppress that it would instruct the jury at trial that it could consider any credible evidence of Det. Noll's failure to comply with the terms of R.C. 2933.83 presented by the defense in evaluating the reliability of the photospread identification. At trial, however, defense counsel waived the instruction upon inquiry from the trial court.

{¶ 33} In order to prevail on a claim of ineffective assistance of counsel, Harmon must satisfy a two-prong test. First, Harmon must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This first prong requires Harmon to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If Harmon can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id.* To show prejudice, Harmon must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* at 694, 104 S.Ct. 2052.

{¶ 34} In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Woullard,* 158 Ohio App.3d 31, 2004–Ohio–3395, 813 N.E.2d 964, ¶

37 (2d Dist.), citing *Strickland, supra; State v. Parker,* 2d Dist. Montgomery No. 19486, 2003–Ohio–4326, ¶ 13.

**{¶ 35}** "A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *State v. Conley,* 2015–Ohio–2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Smith,* 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *Id.,* citing *State v. Cook,* 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

**{¶ 36}** During trial, the following exchange occurred between the trial court and defense counsel at sidebar:

The Court: Just want to make the record on one specific point and that is that the Court's draft of instructions which I've given to counsel, it included – and I'll mark this as Court's Exhibit No. I. So this is the second draft.

And at Page [five] beginning at Line [sixteen] the bottom of Page [twenty-one] and onto the next page. And that instruction relates to the Court's decision in its motion to suppress that there had arguably been evaluation after the statute that Detective Noll, who was not a blind administrator, inserted himself into the identification procedure that was conducted at Children's Medical Center.

And I ruled in that suppression hearing that the Court would then in the Court's instructions – and this is out of the statute – that the jury may consider any credible evidence [of] non-compliance of this law relating to a

blind administrator conducting a photo identification procedure in determining the reliability of any eyewitness identification resulting from that photo line-up.

Now, I wanted to make sure you have the opportunity, if you want, to go into that area with [Detective] Noll. I don't think there is any evidence to support this instruction going to the jury.

Defense Counsel: Right. And my reason for not, if I remember correctly, [D.M.] testified – I don't believe there was an officer there.

She didn't testify that she picked him out with [eighty] percent certainty and Detective Noll has not stated the same. *I don't feel the necessity to go into the jury instruction. We'll waive that.*

The Court: Okay. *So that's a sound tactical reason for doing that.* Just wanted to make sure we made a record of it.

Defense Counsel: *Given that evidence is not going to the jury*, I would not need to go into that area with this witness.

Trial Trans. 134-135.

{¶ 37} At trial, both Det. Noll and D.M.'s testimony was significantly different than the evidence adduced at the suppression hearing. At trial, D.M. testified that she chose the suspect in photograph five from the photospread because "[h]e looks familiar" and that she'd "seen him before." D.M. never testified that she chose photograph five because she was "eighty percent sure" that he was the individual who shot her, as Det. Noll had testified at the suppression hearing. Upon being cross-examined at trial, D.M. testified that she did not recognize her assailant, and he was someone she had not met

before. Furthermore, D.M. did not offer any testimony with respect to who was in the hospital room when the photospread identification was administered. We also note that neither the State nor defense counsel adduced any evidence at trial that Det. Noll was in the hospital room when the photospread identification was administered to D.M. and questioned her briefly regarding her identification of Harmon as her assailant.

{¶ 38} Simply put, defense counsel made a tactical decision to forego the special jury instruction pursuant to R.C. 2933.83(B)(1) ostensibly based upon the testimony elicited at trial. Without any evidence before the jury demonstrating non-compliance, the trial court was not required to give an instruction with respect to R.C. 2933.83. Therefore, we conclude that defense counsel's decision to waive the jury instruction regarding non-compliance with R.C. 2933.83 was reasonable under the circumstances presented in the instant case, and prejudice is not demonstrated. Thus, the record does not support Harmon's claim of ineffective assistance of counsel.

{¶ 39} Harmon's first and fourth assignments of error are overruled.

{¶ 40} Because they are interrelated, Harmon's second and third assignments of error will be discussed together as follows:

{¶ 41} "APPELLANT'S MIRANDA WARNINGS WERE NOT SUFFICIENTLY PROXIMATE TO HIS STATEMENTS, RENDERING HIS WAIVER STALE."

{¶ 42} "APPELLANT'S STATEMENTS TO POLICE SHOULD HAVE BEEN SUPPRESSED."

{¶ 43} In his second assignment, Harmon argues that the *Miranda* warnings he received from Det. Noll became "stale" after extended questioning by the police, and the officers were obligated to issue fresh warnings at some later point during the interview for

his statements and the resulting physical evidence to be admissible at trial. In his third assignment, Harmon contends that his statements to the police should have been suppressed because the interview lasted approximately six hours, and he would have been very hungry. Accordingly, Harmon argues that under these circumstances, his will was overborne and his statements to police were the result of coercion.

{¶ 44} In *State v. Simpson*, 2d Dist. Montgomery No. 25069, 2013-Ohio-1072, we stated the following:

A suspect's decision to waive his Fifth Amendment privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. *State v. Otte* (1996), 74 Ohio St.3d 555; *State v. Petitjean* (2000), 140 Ohio App.3d 517. Coercive police activity is a necessary predicate to finding a confession involuntary within the meaning of the Due Process Clause of the Fourteenth Amendment. *State v. Wiles* (1991), 59 Ohio St.3d 71.

The voluntary nature of a defendant's statement is determined from the totality of the circumstances. *State v. Slagle* (1992), 65 Ohio St.3d 597; *State v. Treesh* (2001), 90 Ohio St.3d 460. A confession is involuntary if, on the totality of the circumstances, the defendant's will was overborne by the circumstances surrounding his giving of the confession. *Dickerson v. United States* (2000), 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405; *Petitjean, supra.*

The totality of the circumstances test takes into consideration both

the characteristics of the accused and the details of the interrogation. *Petitjean, supra.* Factors to be considered include the age, mentality and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *State v. Edwards* (1976), 49 Ohio St.2d 31. Use of deceit by the interrogating police officers and misrepresentations made to the suspect about the evidence police possess do not *per se* render a confession involuntary, *per se.* Rather, it is but one factor bearing on voluntariness. *State v. Cooey* (1989), 46 Ohio St.3d 20.

***

Whether an accused's confession was voluntary for purposes of the Fifth Amendment presents a question of law. An appellate court reviews that issue de novo, not being bound by the trial court's judgment on the same legal issue. The appellate court must give strong deference to the trial court's findings of the facts which underlie a claim of involuntariness.

***

*Miranda* warnings do not foreclose a further inquiry whether a defendant's will was overborne by the circumstances surrounding the giving of a confession. * * *. The focus of that inquiry is whether police overreaching during the interrogation process was such as to overbear the defendant's will to resist and bring about a confession which is involuntary because it was not freely self-determined. * * *.

*Id.* at ¶¶ 52, 53, quoting *State v. Waldo,* 2d Dist. Champaign No. 99CA24, 2001 WL 1103330, * 3, *4 (Sept. 21, 2001).

**{¶ 45}** Regarding the alleged staleness of the *Miranda* warnings, this Court previously noted:

Because custodial interrogation is inherently coercive, incriminating statements which are the product of such questioning are not admissible unless [*Miranda*] warnings precede that questioning. *Miranda v. Arizona* (1966), 384 U.S. 436. Those warnings are indispensable in overcoming the pressures of custodial interrogation and insuring that the individual knows he is free to exercise his right to remain silent at that time. *Id.* This suggests that the warnings should be sufficiently proximate in time and place to any interrogation so as to preserve the relief from custodial pressures that the warnings are intended to create. *State v. Butler* (September 18, 1998), Montgomery App. No. 16852, [1998 WL 654458,] unreported. When an individual to whom prior [*Miranda*] warnings were properly given is subsequently interrogated without being re-advised of his [*Miranda*] rights, the critical issue is whether that individual nevertheless remained aware of his rights at the time of the subsequent interrogation. [*Butler, supra.*] In making that determination, courts must consider the totality of the circumstances, including:

(1) [T]he length of time between the giving of the first warnings and subsequent interrogation, * * * (2) whether the warnings and the subsequent interrogation were given in the same or different places, * * * (3) whether

the warnings were given and the subsequent interrogation conducted by the same or different officers, * * * (4) the extent to which the subsequent statement differed from any previous statements; * * * [and] (5) the apparent intellectual and emotional state of the suspect. *State v. Roberts* (1987), 32 Ohio St.3d 225, 232.

*State v. Parrish,* 2d Dist. Montgomery No. 21091, 2006–Ohio–2677, ¶ 26–27.

**{¶ 46}** The record establishes that Harmon was arrested by Officer Carr of the Huber Heights Police Department at approximately 6:55 p.m. on September 7, 2013. At 7:10 p.m., Harmon was placed in an interview room at the Huber Heights Police Department, at which Det. Noll offered Harmon something to drink. At 7:46 p.m., Det. Noll advised Harmon of his *Miranda* rights, and Harmon indicated that he understood his rights, even reading a portion of the pre-interview form aloud. Harmon then agreed to speak with Det. Noll after he signed the waiver of rights form. Thereafter, the interrogation continued until 8:42 p.m., when Det. Noll permitted Harmon to take a break and smoke a cigarette. While outside during the break in questioning, Harmon offered to direct the officers to "where some property was." At that point, Det. Noll and Sgt. Eagan handcuffed Harmon, placed him in a cruiser, and drove to where Harmon directed them.

**{¶ 47}** At approximately 10:16 p.m., Det. Noll returned to the police station with Harmon and placed him back in the interview room. Harmon remained handcuffed at this time. Det. Noll continued questioning Harmon regarding the location of the handgun. At 10:43 p.m., Harmon asked Det. Noll, "[i]f I show you where the gun is, can I smoke some weed." Det. Noll replied, "[n]o, but I can get you a hamburger." At 11:39 p.m.,

Harmon informed Det. Noll that he threw the gun "to the right" in a yard nearby D.M.'s residence and would direct them to exactly where the gun was located. Det. Noll testified at the suppression hearing that he "had all the intentions of getting him some food," but because of the late hour, he was unable to find any place that was open on the way to where the gun was supposedly located. Once again, Det. Noll and Sgt. Eagan took Harmon to the area where he indicated that he had discarded the handgun. Harmon was subsequently booked into the Montgomery County Jail at approximately 1:17 a.m. on September 8, 2013. Although the handgun was not found at that time, police officers went back to the same location during daylight hours and were able to retrieve the weapon close to where Harmon had indicated it was discarded.

{¶ 48} Initially, we note that Harmon did not advance a "staleness" argument in his motion to suppress before the trial court. Accordingly, we review Harmon's staleness argument for plain error. In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights. *State v. Norris,* 2d Dist. Montgomery No. 26147, 2015–Ohio–624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 49} Upon review, we find that the record establishes on September 7, 2013, Harmon was twenty-one years old. Harmon had a criminal history of misdemeanor offenses, and on one prior occasion, he had been advised of his *Miranda* rights. During the interview, Det. Noll nformed Harmon that they wanted to help him, but he should tell them where the gun was located. Det. Noll did tell Harmon that leaving a loaded

handgun just laying around is very dangerous, and it would be tragic if a child were to find to the gun and hurt him or herself. The Court found that the overriding reason Harmon agreed to tell Det. Noll the location of the gun was an apparently successful appeal to Harmon's conscience, to wit: "the urgency of retrieving the loaded gun before a child would find it and, believing it was toy, would cause serious injury or death." We must defer to the trial court's finding on this issue as there is no evidence that Harmon's will was overborne

{¶ 50} Additionally, the record supports the trial court's finding that Harmon did not appear to be under the influence of any drugs or alcohol during the interview. Harmon appears to have been alert and coherent. Harmon also appears relaxed during the interview. At no point during questioning did Harmon request an attorney nor did he request to end the interview. Furthermore, Harmon was offered water and bathroom breaks. At no time did Harmon complain of hunger. Having thoroughly reviewed the record, we conclude that there is nothing herein to suggest police overreaching, or that Harmon's will was overborne.

{¶ 51} Finally, regarding Harmon's *Miranda* warnings, it is clear that he was initially advised of his rights by Det. Noll, indicated his understanding of his constitutional rights, and signed the waiver of rights form. The entirety of the admittedly lengthy interview was primarily conducted by Det. Noll. The questioning of Harmon occurred in an interview room at the Huber Heights Police Department or outside where Harmon was permitted to smoke a cigarette. In other words, Harmon's *Miranda* warnings were sufficiently proximate in time and place to his interrogation. *See State v. Simpson*, 2d Dist. Montgomery No. 25069, 2013-Ohio-1072, ¶¶ 56, 57, 58.

{¶ 52} Harmon's second and third assignments of error are overruled.

{¶ 53} Harmon's fifth and final assignment of error is as follows:

{¶ 54} "THE TRIAL COURT FAILED TO PROPERLY MERGE APPELLANT'S CONVICTIONS."

{¶ 55} In his final assignment, Harmon contends that the trial court erred when it failed to merge his convictions for aggravated burglary, felonious assault, and robbery.

{¶ 56} R.C. 2941.25, Ohio's allied offense statute, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 57} The Ohio Supreme Court recently clarified the applicable standard when determining whether offenses merge as allied offenses of similar import. *State v. Ruff,* 143 Ohio St.3d 114, 2015–Ohio–995, 34 N.E.3d 892.

Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and

the offenses committed may have different import. No bright-line rule can govern every situation.

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Ruff* at ¶ 30–31.

{¶ 58} Recently, in *State v. Wood,* 2d Dist. Montgomery No. 26134, 2016–Ohio–143, we stated the following:

[T]he Ohio Supreme Court addressed the allied-offense issue again in *State v. Earley,* [145 Ohio St.3d 281], 2015–Ohio–4615, [49 N.E.3d 266]. There the majority characterized the analysis in its earlier [*State v.*] *Johnson* [, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061] lead opinion as "largely obsolete." *Id.* at ¶ 11. The *Earley* court instead embraced *Ruff,* which, as noted above, considers a defendant's *conduct,* his *animus,* and the *import* or significance of his offenses. Applying *Ruff,* the *Earley* court concluded that misdemeanor OVI and felony aggravated vehicular assault "are offenses of dissimilar import and significance that are to be punished cumulatively." *Earley* at ¶ 20. For purposes of our analysis here, we note

that a defendant bears the burden of establishing entitlement to merger, and we review a trial court's ruling on the issue de novo. *State v. LeGrant,* 2d Dist. Miami No. 2013–CA–44, 2014–Ohio–5803, ¶ 15.

\*\*\*

We reach the same conclusion under the *Ruff* standard, which the Ohio Supreme Court applied in *Earley.* We see nothing in *Ruff* that alters or undermines the foregoing analysis about McGail's commission of murder and aggravated robbery involving the same conduct committed with the same animus. For the reasons set forth above, we conclude that the two offenses were not committed separately and were not committed with a separate animus or motivation. These findings remain pertinent under *Ruff,* which, as noted above, provides that offenses do not merge if "(1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Ruff* at ¶ 25; *see also id.* at ¶ 30–31.

*Wood,* at ¶ 54, quoting *State v. McGail,* 2015–Ohio–5384, 55 N.E.3d 513, ¶ 51 & 60 (2d Dist.).

{¶ 59} An appellate court applies a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination. *State v. Williams,* 134 Ohio St.3d 482, 2012–Ohio–5699, 983 N.E.2d 1245, ¶ 28. "The defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999

N.E.2d 661, ¶ 18.

{¶ 60} Harmon was convicted of aggravated burglary in violation of R.C. 2911.11(A)(2), which provides in pertinent part:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense if any of the following apply:

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 61} Harmon was also convicted of felonious assault, in violation of R.C. 2903.11(A)(1) which provides, "[n]o person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn."

{¶ 62} Finally, Harmon was convicted of robbery, in violation of R.C. 2911.02(A)(1), which states in pertinent part:

(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control ***.

{¶ 63} At Harmon's sentencing hearing, the trial court made the following findings:

The Court: *** With regard to whether this aggravated burglary Count 2 merges with the felonious assault (serious physical harm) Count 4, this Court finds that these two offenses, aggravated burglary and the felonious assault, are dissimilar in import and significance in that they both entail

separate identifiable harm. The aggravated burglary entails the harm of trespass by force or stealth into the residence. This is a harm that isn't entailed or involved in the commission of the felonious assault. And the felonious assault entails the harm of infliction of serious physical harm on a person. And that's a harm that is not entailed or involved in the aggravated – that the aggravated burglary doesn't have.

And so, the Court finds the felonious assault Count 4 and the aggravated burglary Count 2 do not merge.

And so, with regard to whether the robbery Count 7 merges with the robbery at the aggravated burglary Count 2, this Court finds that these two offenses are of dissimilar import and significance in that they both entail identifiable separate harm. The robbery entails the harm of commission of theft, a harm that is not required for the aggravated burglary charge; and the aggravated burglary entails trespass by force or stealth into a residence, and this is a harm not required by or not involved in the robbery.

And also, both of these offenses of robbery and aggravated burglary entail separate motivation or animus. The robbery entails the intent to commit a theft, and the aggravated burglary entails the intent to commit felonious assault deadly weapon. And, both offenses were committed separately in that Mr. Harmon completed all of the elements of the aggravated burglary when he then, after that was done, then grabbed the T-shirt and thereby separately committing the robbery. And therefore the Court finds that the aggravated burglary, Count 2, and the robbery, Count

7, do not merge. ***

**{¶ 64}** Upon review, we conclude that the trial court did not err when it denied Harmon's request to merge his convictions for aggravated burglary, felonious assault, and robbery. On the record before us, we find that the aggravated burglary was committed when Harmon broke into D.M.'s residence while carrying a loaded handgun with the intent to cause serious harm to D.M. Once inside the residence, Harmon went to D.M.'s bedroom where she and her friend were sleeping. At this point, Harmon brandished the handgun and shot D.M. in the face. Essentially, the aggravated burglary was completed before Harmon committed the felonious assault offense against D.M. by shooting her in the face. Contrary to Harmon's argument, felonious assault was not an element of aggravated burglary as charged in the indictment. *See State v. Hazely*, 2d Dist. Montgomery No. 27107, 2016-Ohio-7689, ¶ 21. Accordingly, utilizing the *Ruff* analysis in the present case, we find that the aggravated burglary and felonious assault were committed with a separate animus and, thus, were not subject to merger.

**{¶ 65}** The same analysis applies to Harmon's conviction for robbery. Both the aggravated burglary and the felonious assault against D.M. had been completed when Harmon, for whatever reason, decided to steal the t-shirt from D.M.'s bedroom before he fled the residence. Moreover, the force used against D.M. exceeded the force necessary to complete the robbery. *See State v. Stinson*, 2d Dist. Montgomery No. 26449, 2015-Ohio-4405, ¶ 77. Upon review, we therefore conclude that because Harmon had completed the separate offenses of aggravated burglary and the felonious assault, the robbery offense was committed with a separate animus and not subject to merger.

**{¶ 66}** Harmon's fifth and final assignment of error is overruled.

{¶ 67} All of Harmon's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

HALL, P.J. and WELBAUM, J., concur.

Copies mailed to:

Michael J. Scarpelli
Carl Bryan
Hon. Dennis J. Langer