[Cite as *State v. Bonaparte*, 2019-Ohio-2030.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-61 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-613 |
| | : | |
| KYLE BONAPARTE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of May, 2019.

. . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Assistant Prosecuting Attorney, Clark County
Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

BEN M. SWIFT, Atty. Reg. No. 0065745, P.O. Box 49637, Dayton, Ohio 45449
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Kyle Bonaparte appeals from his conviction and sentence for two counts of murder and one count of tampering with evidence. He contends that the State did not present evidence sufficient to sustain the conviction and that the conviction was not supported by the manifest weight of the evidence. Bonaparte also contends the trial court erred by failing to merge the convictions. Finally, he claims trial counsel was ineffective. For the reasons set forth below, we affirm.

## I.    Facts and Procedural History

{¶ 2} On October 4, 2017, Joshua Brown, Raina Beal, Beal's infant son, and Ariel Jones were in Brown's apartment located on Delta Road in Springfield. At some point that evening, Bonaparte and Richard Arnold entered the apartment. Thereafter, Bonaparte shot Brown. Brown returned fire and hit both Bonaparte and Beal. Brown and Beal both died as a result of the shooting.

{¶ 3} Following an investigation, Bonaparte was indicted on one count of murder (purposeful) (Joshua Brown) in violation of R.C. 2903.02(A), two counts of felony murder (proximate result of felonious assault) (Joshua Brown and Raina Beal) in violation of R.C. 2903.02(B), and one count of tampering with evidence in violation of R.C. 2921.12(A)(1). All of the indicted charges carried firearm specifications.

{¶ 4} The trial began with the testimony of Jones, who testified that she, Beal and Brown were watching a movie in Brown's apartment. Jones was seated in a chair by a small round table directly across from the front door of the apartment. Beal, who had her infant son in her lap, was seated in an armchair to the immediate right of the door. Brown was seated in an armchair to the right of Beal and directly to the left of a window.

On the wall across from Brown was a television.

{¶ 5} Jones testified that, at some point in the evening, Bonaparte knocked on the door. When Brown asked who was at the door, Bonaparte replied, "Chiraq." Bonaparte was admitted into the apartment and he sat in a white, plastic chair in the middle of the room facing Brown. Bonaparte asked Brown for marijuana. Shortly thereafter, someone else knocked on the door. Bonaparte opened the door and admitted Arnold into the apartment. Both Bonaparte and Arnold walked over to the window, at which time Brown told them to get away from the window. Bonaparte responded by stating that he was not "in the mood for that." Tr. 748. Brown, who was weighing out the marijuana for Bonaparte, responded, "I don't understand how you can't be in the mood. I just asked you to get out of my window." Tr. 750. At that point, Bonaparte returned to his chair. Arnold remained in the corner by the television.

{¶ 6} Jones further testified that after Brown measured out the marijuana, Bonaparte stood up, collected it and walked over to the table beside Jones. Bonaparte then turned to Brown and said, "I'm not G.D. I'm B.D. So if you think I'm the ops, we can get it popping right now." Tr. 754.[1] No one responded, and Bonaparte said, "Do you feel me?" *Id.* Brown shook his head and stated, "No, I don't feel you." *Id.* Bonaparte then reached into the pocket of his hoodie and removed a firearm. He fired his gun at Brown, who fell backward into his chair. Bonaparte fired three more shots, and Jones saw Brown's face "scrunch up." Tr. 756. Bonaparte then ran to the front door of the apartment. The door was locked and Bonaparte was unable to exit.

---

[1] According to the record, the terms "G.D." and "B.D." are gang references.

**{¶ 7}** According to Jones, after Bonaparte got to the door, Brown produced a firearm and began firing back at Bonaparte. Jones observed Beal "throw her feet out and her hands up; and [her] shoes came off. And when she came back down, she just kind of slumped."[2] Tr. 757. Bonaparte and Brown continued to shoot until Arnold screamed that his "little cousin" was in the room."[3] Tr. 758. At that point, Bonaparte was able to get out of the apartment.

**{¶ 8}** Jones removed the infant from Beal's lap and took him into the bathroom. When she returned to the living room, Arnold was no longer in the apartment. Jones locked the door and went to check on Brown. Brown instructed her to hide his shotgun and money. After complying with Brown's instructions, Jones called 911.

**{¶ 9}** Arnold testified that he was in Brown's apartment with Beal, Jones, Brown and the infant. He testified that he played a video game for approximately 30 minutes before Bonaparte knocked on the apartment door. Arnold testified that Bonaparte bought some marijuana from Brown. Arnold also testified that Brown had a gun resting in his lap. Bonaparte then walked over and opened Brown's window. Brown told Bonaparte to close the window at which time Bonaparte said, "you coming back like I'm a BD or op." Tr. 575. Bonaparte sat down. Arnold was looking at the video game when he heard gun shots. He turned his head and observed that Brown had been shot in the stomach. Arnold testified that at the point he turned his head, Bonaparte and Brown were engaged in a gun fight, but that he did not see Bonaparte shoot Brown.

**{¶ 10}** Arnold testified that once the shooting stopped, he checked on Beal and

---

[2] It was later determined that Brown shot Beal.

[3] Arnold and Beal were cousins.

told Jones to take the infant from Beal's lap. Arnold then left the apartment. As he was leaving the premises, he met another cousin and asked her if she had seen Bonaparte.[4] His cousin informed him that Bonaparte had run away. Arnold called 911 as he was walking away from the apartment complex.

{¶ 11} Damika LeGrand testified that she lived in the same apartment complex as Brown. She testified that she knew both Bonaparte and Arnold and that she observed them around the complex on the date of the shooting. LeGrand testified that she was outside her building when she heard gunfire. She testified that, after the gunfire, she observed Bonaparte collapse to the ground outside the apartment building. LeGrand testified that Bonaparte got up and took off running, but that he came back. She also testified that she saw him appear to be aiming a gun at a blue car. LeGrand testified that when Arnold came out of the building, he approached her and told her to call 911 because Beal had been shot.

{¶ 12} Daniel Fritts and Rita Barnes were both outside of the apartment building at the time of the shooting. Fritts had just delivered some groceries to his cousin, who lived in the apartment complex. He was getting back in the car where Barnes was waiting for him when he heard gunshots. When Fritts got in the car, Barnes began to back into a parking space to turn around to leave. The car was facing the apartment building with its headlights on when Fritts observed a person run out of the building. Fritts observed the person drop a gun onto the concrete. According to Fritts, the person continued to run but then turned around. Fritts testified that the person slid in the grass as he turned

---

[4] Arnold testified that he could not remember or pronounce his cousin's name, but indicated that her name started with the letter D.

back toward the gun. After the person stood up, he retrieved the gun and looked directly at Fritts and Barnes. Fritts and Barnes then left in their car. Fritts testified that the person was wearing a dark hoodie and that the hoodie was either up, or was bunched up around his face.

{¶ 13} Barnes testified similarly to Fritts. However, she did not testify that she observed Bonaparte drop a gun. Instead, she testified that she heard something like metal hitting the sidewalk.

{¶ 14} Springfield Police Officers Meredith Freeman and William Sanders testified that, when they arrived at the apartment, they observed Beal slumped in her chair. They then observed Brown in the bedroom. When they asked him who the shooter was, Brown identified Bonaparte. Brown was transported to a local hospital but was pronounced dead shortly thereafter. Beal was flown to Miami Valley Hospital. She survived on life support for six days before passing away.

{¶ 15} After the shooting, the police were unable to locate Bonaparte. However, on October 19, 2017, Tyler Elliott with the U.S. Marshalls' Fugitive Apprehension Task Force received information that Bonaparte was using his Facebook account. Elliott testified that by using Bonaparte's Facebook information, the Task Force was able to locate him in Portage, Indiana. Portage Police Officer Janis Crafton testified that after Bonaparte was apprehended, she observed a gunshot wound to his right shoulder and a graze wound to his rib cage.

{¶ 16} Phyllis Banks, Roger Lanier's mother, testified that she was with Lanier when he received a call from Bonaparte, who was using his Facebook Messenger account to make the call. Banks, who was a close friend of Beal's mother, listened to

the conversation during which Bonaparte stated that he did not intend for Beal to be killed. Bonaparte also said "F * * * J.B.   He had it coming anyway.   I'm not worried about that nigga."   Tr. 926; State's Exh. 69.

{¶ 17} In the recording of the call, Bonaparte also stated that Brown "already had it coming and that [Bonaparte] should have waited and caught [Brown] alone." Bonaparte also stated that he "got to clapping" after he observed Brown take the safety off his gun.[5]   Bonaparte stated that he shot Brown five times.   Later in the call, Bonaparte appeared to recount a conversation he claimed to have had with Brown. Specifically, Bonaparte stated that, after he shot Brown, Brown said, "What you mean?" Bonaparte then claims that he replied, "You took your gun off safety and pointed it at me. You should have started clapping at me."

{¶ 18} The jury convicted Bonaparte on all counts and on all of the firearm specifications.   A sentencing hearing was conducted on April 26, 2018.   The trial court merged the purposeful murder and felony murder convictions related to Brown, and the State elected to proceed to sentencing on the conviction for purposeful murder.   The trial court imposed a mandatory prison term of 15 years to life for that conviction.   The court also imposed a mandatory prison term of 15 years to life for the felony murder conviction relating to Beal.   A prison term of 36 months was imposed for the tampering with evidence conviction.   The trial court ordered the sentences to run consecutively.   The trial court also merged the firearm specifications for the purposeful murder count and the felony murder count and imposed a mandatory prison term of three years on that specification.   The court imposed a one-year mandatory prison term for the firearm

---

[5] According to the record, "clapping" means shooting a gun.

specification attached to the tampering with evidence conviction. Bonaparte was sentenced to an aggregate mandatory prison term of 34 years to life plus 36 months.

{¶ 19} Bonaparte appeals.

## II.    Sufficiency and Manifest Weight of the Evidence

{¶ 20} Bonaparte's first and second assignments of error state as follows:

BONAPARTE'S CONVICTIONS ARE NOT SUPPORTED BY THE SUFFICIENCY OF EVIDENCE.

THE MANIFEST WEIGHT OF THE EVIDENCE WEIGHS AGAINST BONAPARTE'S CONVICTIONS.

{¶ 21} Bonaparte contests both the weight and the sufficiency of the evidence presented at trial.

{¶ 22} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist. 2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 23} "When an appellate court analyzes a conviction under the manifest weight

of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." (Internal citations omitted.) *State v. Dossett*, 2d Dist. Montgomery No. 20997, 2006-Ohio-3367, ¶ 32.

{¶ 24} Further, the credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 25} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that

a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Saxton*, 2016-Ohio-1233, 61 N.E.3d 830, ¶ 8 (10th Dist.), citing *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11, citing *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15. Therefore, a determination that a conviction is supported by the weight of the evidence is also dispositive of the question of the sufficiency of the evidence. *Id.*

{¶ 26} Bonaparte was convicted of murder in violation of R.C. 2903.02(A), which provides that "[n]o person shall purposely cause the death of another * * *." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 27} Bonaparte contends that the evidence presented by the State was not sufficient to support the conviction for Brown's murder. In support, he argues that he acted in self-defense when he shot Brown. He also argues that the State did not prove that he shot Brown at close range as claimed in the bill of particulars.

{¶ 28} We note that the bill of particulars does state that Bonaparte shot Brown at close range, and it appears from the record that the State relied in part upon the claim that Bonaparte shot Brown at close range to prove that he acted with the requisite intent. We have found no law that requires a person to shoot another at close range in order to determine that he acted purposefully. However, the record does contain competent, credible evidence that the apartment was quite small and that Bonaparte was necessarily standing in close proximity to Brown when he shot Brown. There was also competent

evidence that Bonaparte stood directly in front of Brown and fired at him four to five times before Brown pulled his gun and fired back. Based upon this evidence, a jury could have reasonably found that Bonaparte acted purposefully.

{¶ 29} With regard to the self-defense argument, as discussed in Part IV, below, there is no competent evidence in this record to support a finding that Bonaparte acted in self-defense.

{¶ 30} Bonaparte was also convicted of felony murder in violation of R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code. Since the felony murder conviction involving Brown merged with the purposeful murder conviction, we need only consider the felony murder conviction relating to Beal. The underlying felony for the felony murder conviction as charged by the State was felonious assault, which is proscribed by R.C. 2903.11. That statute provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 31} Bonaparte claims that there was insufficient evidence to support the conviction for the felony murder of Beal. In support, he again argues that Brown was the first aggressor. He also argues that Brown was responsible for Beal's death.

**{¶ 32}** We first note that there was sufficient evidence to support a conviction for the underlying offense of felonious assault, because there was evidence in the record upon which a reasonable juror could have concluded that Bonaparte caused Brown physical harm by means of a deadly weapon. As previously stated, we find no competent evidence to support a claim that Brown was the first to draw a gun.

**{¶ 33}** We next turn to the issue of whether Bonaparte can be held responsible for Beal's death even though Brown was the one who actually shot her. This court has previously upheld a felony-murder conviction when the victim was killed by someone other than the defendant. *See State v. Hibbler*, 2d Dist. Clark No. 2001-CA-43, 2002-Ohio-4464. The critical question is whether Bonaparte's act of committing felonious assault against Brown was the proximate cause of Beal's death. *Id.* at ¶ 22, fn. 6. As we stated in *State v. Dixon*, 2d Dist. Montgomery No. 18582, 2002-Ohio-541:

> * * * Under the "proximate cause theory," it is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. Defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the "proximate result" of Defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience. * * *

*Id.* at * 5.

{¶ 34} The evidence in this case easily supported the conclusion that Beal's death was a direct, natural, and foreseeable consequence of Bonaparte's felonious assault against Brown. *Accord Hibbler* at ¶ 22, fn. 6. Therefore, we conclude that the record supports the conviction for felony murder.

{¶ 35} Finally, Bonaparte was convicted of tampering with evidence as proscribed by R.C. 2921.12(A)(1). That statute provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

{¶ 36} Bonaparte contends that the eyewitness identifications made by Fritts and Barnes were not reliable and that, without those identifications, there was no evidence to support his tampering with evidence conviction. He also argues that the State failed to demonstrate that he was aware that an investigation was likely to ensue. Finally, he contends that Ohio law does not permit a conviction for tampering with evidence when the tampering occurs simultaneously with the offense.

{¶ 37} We begin with the eyewitnesses. At trial, Fritts and Barnes both identified Bonaparte as the individual who ran out of the apartment building and who dropped and retrieved a gun. As we note in Part IV, below, the jury was aware of the circumstances surrounding the eyewitness identifications. However, that was an issue going to the weight of the identification evidence, and thus subject to jury resolution. Further, Legrand's testimony corroborated these identifications as she indicated that she observed Bonaparte fall outside of the building and then appear to aim a gun at a blue car. Thus, we conclude that the finding that Bonaparte dropped and retrieved his gun when he exited

the apartment building was supported by the weight of the evidence.

{¶ 38} Bonaparte next argues that the State did not prove that he knew "that an official proceeding or investigation [was] * * * likely to be instituted" when he retrieved the gun. R.C. 2921.12(A). In support, he cites *State v. Barry*, 145 Ohio St.3d 354, 2015-Ohio-5449, 49 N.E.3d 1248, for the proposition that "Ohio law does not impute constructive knowledge of an impending investigation based solely on the commission of an offense." *Id.* at ¶ 2.

{¶ 39} In *Barry*, Barry's friend gave her a condom filled with heroin, which she hid in her vagina. *Id.* at ¶ 5. Later, she was driving a vehicle with her friend and two other people when she was pulled over for a traffic violation. *Id.* at ¶ 6. The officer smelled marijuana and executed a search of the vehicle, which revealed a baggie with marijuana residue. *Id.* After speaking with all of the occupants of the vehicle, the officer asked Barry whether there were any drugs concealed in her body. *Id.* at ¶ 7. Barry initially denied it, but eventually produced the heroin for a female officer. *Id.* Barry was indicted and convicted on various drug offense charges and tampering with evidence. *Id.* at ¶ 8 and 10. The court of appeals affirmed the conviction for tampering with evidence and concluded that Barry had constructive knowledge that an investigation was likely when she hid the drugs in her vagina. *Id.* at ¶ 11. In reversing the conviction, the Supreme Court stated:

> Here, the state failed to prove that Barry was aware that an investigation into her drug trafficking and possession was likely at the time she concealed evidence of those crimes. When she hid the heroin in her vaginal cavity in Middletown, Ohio, only her coconspirators were present

and could have reported her drug offenses, and nothing in the record shows that she thought it likely that she would be stopped by law enforcement. Notably, Trooper Lewis came to suspect Barry of possessing drugs only after he stopped her vehicle south of Lucasville hours later. Nor is there any evidence that Barry displayed willful ignorance by placing the heroin in her vaginal cavity with a subjective belief that an investigation was likely. Rather, she concealed the drugs with a purpose to avoid detection by law enforcement and without knowledge of an impending or likely investigation. Thus, her conviction for tampering with evidence is not supported by sufficient evidence.

*Id.* at ¶ 27.

**{¶ 40}** The Ohio Supreme Court later addressed another case involving the claim that the defendant could not be convicted of tampering with evidence because the State failed to prove that he knew an investigation would ensue. *See State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857. In *Martin*, the defendant shot two people and then fled the scene. *Id.* at ¶ 11-13, 22. Sometime thereafter, he burned the clothes that he wore during the commission of the offenses. *Id.* at ¶ 21. He was subsequently charged with and convicted of various offenses, including tampering with evidence. *Id.* at ¶ 24. On appeal, Martin argued that the State did not prove that he knew or was aware that an investigation of the matter would ensue. The Supreme Court addressed his argument, stating:

> We find *Barry* distinguishable. The underlying offense in *Barry* was heroin possession, and the tampering alleged in that case was the

defendant's concealment of the heroin in a body cavity. But when the defendant concealed the heroin, she had no reason to believe that the police would investigate her, for "only her coconspirators were present * * * and nothing in the record shows that she thought it likely that she would be stopped by law enforcement." * * * On those facts, the issue before us was "whether knowledge that an official proceeding or investigation is pending or likely to be instituted can be imputed to one who commits a crime, regardless of whether that crime is likely to be reported to law enforcement." [*Barry*] at ¶ 17.

But *Barry* does not foreclose the possibility that knowledge of a likely investigation may be inferred when the defendant commits a crime that is likely to be reported. Here, the crime was not a possessory offense; it was homicide. Homicides are highly likely to be discovered and investigated. Certainly, a jury may reasonably believe that a murderer knows this.

*Id.* at ¶ 117-118.

**{¶ 41}** Here, Bonaparte shot Brown numerous times at close range. He was aware that there was at least one witness to the shooting. Thus, as in *Martin*, we conclude that the jury could have reasonably inferred that Bonaparte knew that the offenses were likely to be investigated.

**{¶ 42}** Next, Bonaparte cites *In re T.R.J.*, 11th Dist. Lake No. 2016-L-010, 2016-Ohio-7160, for the proposition that "[t]he tampering with evidence statute does not apply to acts of hiding evidence, simultaneously with the underlying offense, which do not involve a separate animus or intent." *Id.* at ¶ 33, citing *Barry*. Upon review, *T.R.J.*

turned on whether the juvenile had knowledge of an impending investigation when he hid marijuana in a trash can, and, thus, is not particularly relevant to the argument that a defendant cannot be guilty of tampering with evidence when the "tampering" occurs simultaneously with the underlying offense. More relevant are cases where it has been found that the absence of a gun at a crime scene where a gun has been used does not, without more, support a conclusion that the defendant removed the gun to impair its availability as evidence. *State v. Like*, 2d Dist. Montgomery No. 21919, 2008-Ohio-1873, ¶ 24; *State v. Mabra*, 2d Dist. Clark No. 2014-CA-147, 2015-Ohio-5493, ¶ 26-29. These cases are distinguishable, because in this case the jury could have reasonably concluded that Bonaparte, upon dropping the gun, returned to retrieve it so that it would not be found and used as evidence against him.

{¶ 43} We conclude that the State presented sufficient evidence to permit a reasonable juror to conclude that Bonaparte committed each offense. Further, we find no reason to conclude that the convictions were against the manifest weight of the evidence. Although Bonaparte notes that there were inconsistencies in the testimony of Jones and Arnold, the jury was free to give credence to Jones's testimony without regard to Arnold's.

{¶ 44} The first and second assignments of error are overruled.

### III.     Merger

{¶ 45} Bonaparte's third assignment of error provides:

THE TRIAL COURT ERRED WHEN IT SENTENCED BONAPARTE

SEPARATELY FOR ALL HIS OFFENSES WHEN THEY WERE ALLIED

OFFENSES OF SIMILAR IMPORT.

{¶ 46} Bonaparte's entire argument in this assignment of error states that "the acts of Murder and Tampering with Evidence were all committed by the same actor and with the same animus and similar import, and, therefore, the trial court was statutorily precluded from imposing sentences on all of these counts."

{¶ 47} Merger of allied offenses of similar import is governed by R.C. 2941.25, which provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 48} Offenses do not merge and a defendant may be convicted and sentenced for multiple offenses if any of the following are true: "1) the offenses are dissimilar in import or significance * * *; 2) the offenses were committed separately; [or] 3) the offenses were committed with separate animus or motivation." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 25. Under *Ruff*, "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each

offense is separate and identifiable." *Id.* at ¶ 23. We apply a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶ 49} As stated above, the convictions for murder in Counts I and II were both related to Brown's death and were, thus, appropriately merged by the trial court. The State elected to proceed to sentencing on the conviction for murder in Count I. Bonaparte argues that the conviction for murder in Count I should also merge with the murder conviction in Count III. However, Count III relates to Beal's death. Therefore, under *Ruff*, there is no merger as the convictions involve separate victims. *Id.* at ¶ 23.

{¶ 50} Bonaparte next contends that his conviction for tampering with evidence should have merged with the murder convictions. We disagree. Bonaparte's conduct constituting tampering with evidence was obviously separate and distinct from the conduct resulting in the murder convictions. Thus, there was no basis for the trial court to merge the tampering with evidence count with the murder counts.

{¶ 51} The third assignment of error is overruled.


## IV.     Ineffective Assistance of Counsel

{¶ 52} Bonaparte's fourth assignment of error states as follows:

BONAPARTE RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

{¶ 53} Bonaparte contends that he was denied effective assistance of trial counsel because counsel failed to:  (1) seek suppression of both the pretrial and in-court identifications made by Barnes and Fritts; (2) pursue self-defense as an affirmative

defense; and (3) request an instruction on voluntary manslaughter as a lesser-included offense of murder.

{¶ 54} In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. The defendant must demonstrate two elements to establish such a claim: 1) that counsel's representation fell below an objective standard of reasonableness; and 2) that counsel's errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the proceeding would have been different. *Id.* In our review of an ineffective assistance of counsel claim, "we will not second-guess trial strategy decisions, and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. English*, 2d Dist. Montgomery No. 26337, 2015-Ohio-1665, ¶ 10, quoting *State v. Mason*, 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998).

{¶ 55} We turn first to the claim that counsel should have sought suppression of the in-court identifications made by Barnes and Fritts. Bonaparte's argument on this issue centers on his claim that the in-court identifications made by Barnes and Fritts were invalid because both Fritts and Barnes identified two different individuals during the pretrial photographic lineup. He also states, "[i]mportantly, whether the procedure itself was suggestive is questionable; * * * the reliability of their pre-trial identification alone creates an indefinite irreparable misidentification of Bonaparte at trial."

{¶ 56} " * * * [D]ue process requires a court to suppress the witness's identification

of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances." *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 19. The defendant "bears the burden of showing that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' and that the identification itself was unreliable under the totality of the circumstances." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *2 (Feb. 22, 2002), quoting *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). If the defendant meets that burden, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure. However, "[i]f the pretrial confrontation procedure was not unfairly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required." *State v. Harmon*, 2017-Ohio-8106, 98 N.E.3d 1238, ¶ 19 (2d Dist.), citing *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 209.

{¶ 57} Springfield Detective Daniel DeWine testified that he was the lead detective on this case. He testified that he used a computer program to generate the photographic identification arrays, with one array presented to Fritts and the second presented to Barnes. He testified that the program is designed to assemble an array of individuals who are similar in appearance. He further testified that the array is then given to a blind administrator who shows the array to the witnesses. According to DeWine, a blind administrator is an individual who is not involved in the investigation and does not know the facts of the case.

{¶ 58} Springfield Detective Sandra Fent testified that she was the blind administrator for the arrays shown to Fritts and Barnes. She testified that she was not involved in the investigation of the case and that she was not familiar with the case other than knowing that it involved a shooting. She testified that Fritts and Barnes were shown an array at separate times and that they were advised that the suspect may or may not be shown in the pictures.

{¶ 59} Neither Fritts nor Barnes was able to make a positive identification of Bonaparte from the photo arrays; however, they each picked out two different photos resembling the man they observed outside the apartment building.[6] On the pretrial identification form, Fritts indicated to Fent that he did not get a good look at the suspect, and, thus, was not one-hundred percent sure about his identification. Likewise, Barnes indicated that she was not positive about her identification. Both witnesses made in-court identifications during trial.

{¶ 60} The photographic arrays presented to Fritts and Barnes are in the record of this case. We have examined them and find nothing to suggest that the photo arrays or the identification procedure performed by Fent were unduly suggestive. The photo arrays each contained six color photographs of younger men of approximately the same age, hair color, and eye color. All of the individuals are in similar attire, and all appear to have at least a trace of a mustache. Other than one background which appears slightly darker than the others, the backgrounds are similar.[7] Also, the evidence indicates that

---

[6] Bonaparte was one of the two individuals chosen by both Fritts and Barnes.

[7] Bonaparte's picture is not the one with the darker background.

the arrays were properly presented to Fritts and Barnes.

{¶ 61} Based upon this record, we conclude neither the photographic arrays nor the procedure used by Fent was suggestive. Therefore, the inability of Fritts and Barnes to identify only one individual in the arrays raised a question as to the weight of the identification evidence rather than the suggestibility of the array and the identification procedure. *See Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *2 (in absence of a suggestive array, the trial court did not err in declining to suppress a pretrial identification, despite fact that witness picked out two photographs as resembling the individual observed by the witness).

{¶ 62} Thus, we conclude that the trial court had no basis for suppressing the pretrial identifications, and therefore no basis for suppressing the in-court identifications. It necessarily follows that trial counsel did not provide ineffective assistance by failing to seek suppression.[8]

{¶ 63} We next address the claim that counsel was ineffective for failing to raise a claim of defense of self-defense. " 'Self-defense is an affirmative defense, which means that the burden of going forward is on the defendant who must prove each element by a preponderance of the evidence.' " *State v. Oates*, 2013-Ohio-2609, 993 N.E.2d 846, ¶ 10 (3d Dist.), quoting *State v. Kimmell*, 3d Dist. Wyandot No. 16-10-06, 2011-Ohio-660, ¶ 19. (Other citations omitted.) In order to establish self-defense involving the use of deadly force, a defendant must introduce evidence showing that: (1) that the defendant was not at fault for creating the situation giving rise to the use of deadly force; (2) that the

---

[8] As an aside, we note that trial counsel conducted a thorough cross-examination of both Fritts and Barnes and thereby brought any questions regarding the reliability of the identifications to the attention of the jurors.

defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that the only means of escape was the use of deadly force, and (3) the defendant did not violate a duty to retreat. *State v. Gray*, 2d Dist. Montgomery No. 26473, 2016-Ohio-5869, ¶ 8, quoting *State v. Thompson*, 141 Ohio St.3d 254, 23 N.E.3d 1096, 2014-Ohio-4751, ¶ 258 quoting *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).[9]

{¶ 64} Bonaparte claims that the preponderance of the evidence established his right to assert a self-defense claim. His argument hinges upon his assertion that Brown was the first to draw a gun.

{¶ 65} As noted above, during his call to Lanier, Bonaparte did indicate that Brown had a gun, that Brown "took the safety off," and that Bonaparte then drew his gun and began to shoot. Later in the call, Bonaparte stated that Brown and he had engaged in a short verbal exchange after Brown had been shot five times. Specifically, Bonaparte claimed that Brown asked why Bonaparte shot him and that Bonaparte replied, "You took your gun off safety and pointed it at me. You should have started clapping at me." State's Exh. 69. Bonaparte contends that this conversation was evidence that Brown was the initial aggressor and that Bonaparte had had a bona fide belief that he was in immediate danger.

{¶ 66} Bonaparte's out-of-court exculpatory statement that he claims supports an instruction on self-defense was clearly offered to prove the truth of the matter asserted:

---

[9] Bonaparte's conduct occurred before the March 28, 2019effective date of R.C. 2901.05(B) which places the burden on the State to prove beyond a reasonable doubt that the force was not used in self-defense when there is "evidence presented that tends to support that the [defendant] used the force in self-defense * * *."

that he acted in self-defense. Thus, it constituted hearsay and was inadmissible. Evid.R. 801(C). Other than this self-serving hearsay statement by Bonaparte, there was no evidence, let alone competent evidence, to support his claim that he acted in self-defense. Therefore, if Bonaparte had wished to rely on his claim that Brown was the first to aim his gun, he would have been required to testify during trial and submit to cross-examination by the State. Trial counsel could very well have made a strategic decision not to subject Bonaparte to cross-examination.

{¶ 67} Given the state of this record, we cannot say that trial counsel was ineffective for failing to pursue the affirmative defense of self-defense.

{¶ 68} Finally, Bonaparte contends that counsel should have requested an instruction on voluntary manslaughter as a lesser-included offense of murder.

{¶ 69} Voluntary manslaughter is an inferior degree of murder. *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992). A defendant on trial for murder "is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." (Citations omitted.) *Id.* Voluntary manslaughter is proscribed in R.C. 2903.03(A), which states that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." Thus, unlike murder, voluntary manslaughter includes the mitigating element of serious provocation by the victim reasonably sufficient to incite the defendant into using deadly force. *State v. Thomas*, 2d Dist. Montgomery No. 19131, 2003-Ohio-42, ¶ 17.

{¶ 70} When considering whether to give an instruction on voluntary manslaughter, the trial court must employ a two-part analysis. "In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in the particular case, actually was under the influence of a sudden passion or in a sudden fit of rage. It is only at that point that the ' * * * emotional and mental state of the defendant and the conditions and circumstances that surrounded [him] at the time * * * ' must be considered." *Shane* at 634, quoting *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph five of the syllabus.

{¶ 71} The Ohio Supreme Court has repeatedly cautioned that a trial court need not give the instruction every time "some evidence" is presented going to the inferior degree offense. *Id.* at 633.

{¶ 72} Bonaparte claims he proved that he acted in a sudden passion or fit of rage. In support, he argues as follows:

When Bonaparte arrived at [Brown's] apartment, he was let in and the door was locked behind him. [Brown] already had a gun in his lap. Drugs were being sold. Tension was already in the air, words were spoken, and [Brown] picked up his gun first, releasing the safety on his gun. * * * And [Arnold] believed this as well by testifying that he believed [Brown] was going to kill [Bonaparte] * * *."

{¶ 73} Again, other than Bonaparte's self-serving statement to Lanier, there was no evidence that Brown was the first to pick up a gun and fire. The only other eyewitness

to the entirety of the exchange of gunfire was Jones, whose testimony contradicted Bonaparte's statement to Lanier. Indeed, Jones's testimony indicated that Bonaparte fired four or five shots at Brown, who fell back into his chair before he produced a gun and fired back. Bonaparte's own statements to Lanier supported a finding that he fired at Brown five times before Brown returned fire. Further, according to Jones, Bonaparte did not attempt to run away until Brown fired back. This evidence indicates that Bonaparte acted purposefully rather than in a sudden passion or fit of rage. Further, any suggestion that the argument over the window was enough to cause Bonaparte to act in a sudden passion or fit of rage is undermined by the fact that Bonaparte sat back down and waited for Brown to finish packaging the marijuana after the words were exchanged. On this record, we cannot conclude that trial counsel was ineffective by not requesting a voluntary manslaughter instruction.

{¶ 74} We conclude that Bonaparte has not demonstrated that he was entitled to either a self-defense or voluntary manslaughter instruction. We further conclude that there was no basis for suppressing the identification testimony of Fritts or Beal. Therefore, we cannot conclude that trial counsel was deficient for failing to pursue a suppression motion or by failing to seek instructions on self-defense and voluntary manslaughter.

{¶ 75} Accordingly, the fourth assignment of error is overruled.

## V. Conclusion

{¶ 76} All of Bonaparte's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.


Copies sent to:

John M. Lintz
Ben M. Swift
Hon. Richard J. O'Neill